THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFF BLAKE, Defendant-Appellant.

First District (1st Division)   No. 86—1168

Opinion filed January 23, 1989.

Randolph N. Stone, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Jean T. McGuire Quinn, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Jeff Blake was accused of killing his mother, Mrs. Celia Blake, and Mr. Willie Lowe, and charged with two counts of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) and two counts of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2). Blake was convicted of both murders and one count of armed robbery and sentenced to natural life imprisonment. Blake appeals the convictions, arguing that several evidentiary rulings were erroneous. For the reasons below, we affirm.

Mrs. Celia Blake owned and managed six apartment buildings and employed her son Jeff Blake, Frank Fortune, James Skinner, Milton Scott, and Willie Lowe. Blake and Fortune were close friends and used drugs together about four to five times a week. Blake usually paid for the drugs, using his pay, and sometimes borrowing from Celia.

In the morning of November 22, 1983, Blake asked his mother several times for money, which she refused, triggering angry arguments that were witnessed at various times by Fortune, Scott, Skinner, and Lowe. In the early morning a neighbor was present when Blake asked Celia for money and she refused. Later, while Blake, Celia and James Skinner were driving Blake's children to school, Blake and Celia argued a second time. Skinner later testified that arguments about money between Blake and Celia were not uncommon.

At about 10:30 a.m., Celia and Blake, Fortune, Scott, Skinner and Lowe were assembled in the furnace room of the building at 6818 Normal, which Celia used as an office. After Celia gave the men their work assignments, Blake again asked for money and Celia again refused. When the argument began the others left. Fortune waited outside for Blake, who came out a few minutes later and, according to Fortune, said, "[S]he will regret that."

Later in the morning, Skinner borrowed $20 from Celia, which he gave to Blake. Blake and Skinner then went to fix a faucet and collect rent. After the faucet was fixed, Skinner, Scott and Lowe were present in the furnace room when Celia again refused Blake's request for $20. Skinner gave Celia $300 in rent money he had collected.

In the early afternoon, Celia sent Skinner to repair the refrigerator in the apartment of Evelyn Williams. Blake went to find Williams to let them into her apartment, and Fortune, Scott and Skinner went to Williams' apartment. Williams arrived and let Skinner and Scott

into the apartment while Fortune sat on the steps smoking a cigarette. Blake was not present.

While Fortune was on the steps, Lowe arrived, saying that Blake had sent him because Scott wanted him to help with the refrigerator. When Lowe learned that Scott did not need him, he became angry and left. Fortune then went to the lobby of the building to sit in a chair, where he saw Lowe go into the furnace room and heard him talking to Celia. Presently Lowe came out of the furnace room and went into the laundry room across the hall.

At that point, Blake entered the lobby and told Fortune he was going to talk to his mother about how long they would need to work that day. Fortune started to return to Williams' apartment, and as he left the lobby, Lowe came out of the laundry room and went back into the furnace room. Fortune returned to Williams' apartment, where he talked with Skinner, Scott, and Williams. They were shortly joined by Blake, and soon after, Williams let the men out and went to see her sister, who was waiting outside in a car to give Williams a Thanksgiving turkey. Blake and Fortune decided to go to Fortune's place to get something to eat. On the way out, Blake and Fortune passed Williams, who was returning to her apartment.

As Blake and Fortune walked, Blake told Fortune that he had received $40 from his mother and suggested that they use the money to buy drugs. They returned to the building at 6818 Normal and got the car. The two then bought heroin and cocaine for $60 and drove to Fortune's apartment at 6800 Normal. In the car on the way to Fortune's, Blake gave some money to Fortune.

In the meanwhile, Skinner and Scott had returned to the furnace room, where they found the bodies of Celia and Lowe. Skinner called the police. The police arrived shortly before 3 p.m. and found that Celia and Lowe had been beaten with a crowbar that was found behind the furnace. Celia died at the scene; Lowe died later in the hospital. Skinner identified the victims for the police and provided descriptions of Fortune and Blake as persons who had been at the building earlier. At about 3:30 p.m., Blake identified himself to the police and said that he had heard something had happened to his mother. The police observed what appeared to be fresh blood on Blake's jacket and boot and arrested him. Fortune was also taken into custody.

Fortune was interrogated immediately and remained in custody until after he testified before a grand jury on the morning of November 23. Blake was not interrogated until about 9 p.m. Blake was indicted and charged with two counts each of murder and armed robbery.

Prior to trial, Blake moved to quash his arrest and suppress evidence of his interrogation. Blake contended that the arrest had been made without a warrant and without probable cause, and that the interrogation had taken place without a proper waiver of Blake's *Miranda* rights. At the hearing on the motion, Detective Craig Cegieski, who had been assigned to investigate the murders, testified that Blake had appeared calm and alert during all interrogations and had given several contradictory but exculpatory versions of the events of November 22. Blake, who testified at the hearing but not at trial, stated that the police intimidated him, and that he had been under the influence of drugs throughout the interrogations, and that the different versions of events was due to disorientation caused by the drugs. Blake's motion were denied.

At trial, Skinner, Scott, Williams, and Fortune testified to the events of November 22. Fortune further testified that a few weeks before the murders, he had found Blake in one of Celia's buildings, dazed and bloodied. Blake told Fortune that he had been mugged by an intruder. Blake had not reported the mugging to police. Fortune testified that the blood on Blake's jacket had come from that incident and had been on Blake's jacket since.

Fortune further testified that when he and Blake had left the building on November 22 to buy drugs, Blake drove away quickly, and that at that time, Blake seemed to be in a trance, mumbling incoherent words like "will" or "kill" or "hit." Over defense counsel's objection, Fortune admitted that he had testified to the grand jury that Jeff had said, "[L]et's go get a hit [buy drugs]," and "I killed them both," and "I hit them both four times."

Fortune further admitted that he had told the grand jury that when Blake later gave him the money, Blake had stopped the car and counted out $95. During the investigation, police found $95 in a bag in Fortune's apartment. Fortune further testified that he had been mistreated by the police during questioning, that the police had threatened him, handcuffed him to a wall, slapped him, and kicked his chair. Fortune stated that he implicated Blake when testifying to the grand jury because he thought he was in custody. Objections by the State were sustained when defense counsel attempted to ask whether Fortune had lied to the grand jury and whether he had been instructed by police to tell the grand jury what the police wanted him to say.

James Skinner testified to the events of November 22, and stated that while driving the children to school, he had not noticed any blood on Blake's jacket. Proceeding outside the presence of the jury, defense

counsel recalled an interview between himself and Skinner with no others present, and asked Skinner whether he had told counsel that he had noticed the blood. Skinner denied making such a statement. Defense counsel was not allowed to impeach Skinner in the presence of the jury, and the trial court denied counsel's motion to withdraw from the case and testify on Blake's behalf. Skinner also testified that when Blake had arrived in Williams' apartment, he was acting normally and nothing seemed unusual. Milton Scott also testified to the events of November 22.

Evelyn Williams testified that at the time she was returning from meeting her sister and had passed Blake and Fortune in the lobby, she noticed that the door to the furnace room was closed, which seemed unusual because the door was always open when Celia was present.

Detective Cegieski testified that when he met Blake at the scene, the blood on Blake's jacket appeared to be fresh. Cegieski also testified to the content of the interrogations of Fortune and Blake. Cegieski testified that Fortune told police that Blake had told him that he had killed Celia and Willie Lowe. Cegieski further testified that the police had done nothing to injure or intimidate Fortune during the interrogation, and over defense counsel's hearsay objection, related the contents of Fortune's statements to the police. Cegieski also related the different versions of events that Blake gave in interrogation.

Lab tests showed that the blood on Blake's jacket was type A, which matched the blood of Willie Lowe. The blood on Blake's boots was type O, which matched the blood of Celia Blake. Types A and O blood were found on the crowbar, but no fingerprints were taken from the crowbar.

Blake was found guilty of the murders of Celia Blake and Willie Lowe, and guilty of the armed robbery of Celia. Blake was acquitted of the armed robbery of Lowe. Blake was convicted, and after a death penalty hearing, sentenced to concurrent natural life terms in prison and one concurrent 30-year sentence.

Blake appeals several evidentiary rulings by the trial court and the denial of a motion to quash arrest and suppress evidence. All the challenged rulings rested within the discretion of the trial court, however, and an examination of the record shows that in no case were the trial court's rulings clearly erroneous.

■ Blake first argues that the trial court erred in restricting the cross-examination of Frank Fortune. Defense counsel asked Fortune whether he had lied to the grand jury, whether the police had told Fortune what would happen to him after he testified, whether the police told Fortune what to say to the grand jury, and whether Fortune

had been charged and bound over to the court before he was released from police custody. Objection to each question was sustained. Blake argues that the questions were necessary to establish that Fortune had motive to lie to the grand jury, a proper inquiry for cross-examination. See *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852.

The record reveals no grounds for the objections, but supports the State's argument that the question as to whether Fortune lied to the grand jury was repetitive and that no proper foundation was laid for the other questions. Further, any error that arose from sustaining the objections was harmless. Fortune testified that the police handcuffed him, threatened to charge him with murder if he did not talk, slapped him, and kicked his chair. Fortune also testified that when he went to the grand jury, he had been told to "stick to what was on the police report," and that because he was in custody, he implicated Blake. Fortune further testified that the police had made him no promises and that he had been released after testifying to the grand jury. Thus, although defense counsel was not allowed to ask specific questions, the record was sufficient to allow the jury to determine Fortune's credibility as a witness and for counsel to argue his theories to the jury. See *People v. Shinkle* (1987), 160 Ill. App. 3d 1043, 1056, 513 N.E.2d 1072.

The trial court also sustained objections to questions whether Fortune was suffering pain from withdrawal at the time of the grand jury, or whether the police gave him anything to alleviate his discomfort, or whether, at the time of trial, Fortune was still a drug user. Blake contends that these questions served to impeach the credibility of Fortune's grand jury testimony: if Fortune was not still using drugs, his trial testimony would have been made more credible, and his grand jury testimony, made when he used drugs, less credible. See *People v. Lewis* (1962), 25 Ill. 2d 396, 399, 185 N.E.2d 168; *People v. Strother* (1972), 53 Ill. 2d 95, 290 N.E.2d 201.

■ The consideration on appeal of questions concerning Fortune's drug use was waived, however, because there was no offer of proof that Fortune no longer used drugs. (*People v. Montgomery* (1977), 51 Ill. App. 3d 324, 331, 366 N.E.2d 623.) Moreover, in the cases cited by Blake, the witness' drug use at the time of trial was a factor impeaching the credibility of the witness' testimony at trial. Here, however, Blake was not attempting to impeach Fortune's trial testimony. Rather, Blake was attempting to discredit Fortune's prior statements to the grand jury by showing that Fortune was not presently a drug user.

■ Finally, objections were sustained to questions whether For-

tune dripped blood on Blake's boot when they injected drugs and of Fortune's blood type. Blake argues that answers to these questions might have explained the blood on Blake's boot. The objections to questions concerning the blood on the boot and Fortune's blood type were properly sustained because the questions were beyond the scope of direct examination.

Blake contends that the above objections were cumulatively prejudicial because the remainder of the evidence was circumstantial, and that the conviction was improperly predicated on Fortune's prior statement. (See *People v. Paradise* (1964), 30 Ill. 2d 381, 384, 196 N.E.2d 689.) The State responds that any errors were harmless due to the overwhelming evidence of Blake's guilt: several witnesses testified to Blake's demands for money from his mother and her refusals on November 22; Frank Fortune testified he saw Blake go into the furnace room shortly before the murder; Blake had approximately $110 when he and Fortune left in the car; Fortune stated that Blake had told him he had hit both victims four times; Blake had blood on his jacket and the blood on his boot was the same type as Willie Lowe's; and Blake made several inconsistent exculpatory statements to the police. Although the evidence cited by the State was circumstantial, Blake's conviction was not predicated on Fortune's prior statement alone, and it is clear that defense counsel's cross-examination was not unduly restricted.

■ In summary, Blake argues that the trial court improperly restricted the cross-examination of Frank Fortune, but the objections to specific questions did not constitute a blanket restriction. The trial court was within its discretion to limit cross-examination (see *People v. Dowdy* (1986), 140 Ill. App. 3d 631, 635, 458 N.E.2d 1326), and, assuming error, Blake was not prejudiced because the record established a sufficient basis for the jury to determine the credibility of Frank Fortune's testimony both at trial and before the grand jury, and for defense counsel to present his theories of the case to the jury. The trial court's rulings were neither erroneous nor prejudicial.

Blake's second principal argument is that the trial court erroneously restricted the cross-examination of James Skinner and Milton Scott. Defense counsel asked Scott whether the back door of the building at 6818 Normal could be entered with a screwdriver, and asked Skinner whether the lock on the back door of the same building had ever been broken. The trial court sustained general objections to both questions. Blake argues that the questions supported the theory that an intruder murdered the victims.

■ On direct examination, both Skinner and Scott testified only

to the events of November 22, 1983. Neither testified to seeing or hearing an intruder, or to the security of the back door. The questions concerning the security of the back door, therefore, were at best tangential. Cross-examination is limited to those matters that explain, qualify, modify, or discredit the direct examination, and the latitude in cross-examination rests within the discretion of the trial court. (*People v. Hosty* (1986), 146 Ill. App. 3d 876, 882-83, 497 N.E.2d 334, *appeal denied* (1986), 113 Ill. 2d 564.) Although no specific grounds were offered for the objection, the record shows that the questions were beyond the scope of direct examination; the trial court did not abuse its discretion in sustaining the objections.

Blake also argues that the trial court erred by now allowing defense counsel to impeach Skinner's trial testimony that he did not recall seeing blood on Blake's jacket on the morning of November 22. But Skinner denied telling defense counsel, during a private interview, that he had seen the blood. Defense counsel was not allowed to impeach Skinner with the prior statement in the presence of the jury. Defense counsel moved to withdraw from the case and testify on Blake's behalf, pursuant to the Illinois Code of Professional Responsibility, Canon 5, DR 5—102 (107 Ill. 2d R. 5—102). The motion was denied.

■■ ■ Where it is obvious that a lawyer ought to be called as a witness on behalf of his client, he shall withdraw from the case and not continue representation. (107 Ill. 2d R. 5—102.) The trial court, however, has broad discretion to refuse to permit attorneys to testify. (*In re Marriage of Lee* (1985), 135 Ill. App. 3d 509, 481 N.E.2d 1045; *Serpico v. Urso* (1984), 127 Ill. App. 3d 667, 469 N.E.2d 355.) Here, the need for counsel to testify could have been avoided had counsel interviewed the prosecution's witness with others present. After trial commenced, withdrawal would have imposed substantial hardship on the defendant and wasted judicial resources. The trial court acted within its discretion in refusing defense counsel's motion to withdraw.

■ Blake next argues that the admission of Frank Fortune's grand jury testimony under section 115.10—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115.10—1) was erroneous. Blake contends that section 115.10—1, which allows substantive use of prior inconsistent statements, violates the separation of powers doctrine because the authority for promulgating procedural rules is vested in the judiciary, and not the legislature. This court need not address Blake's constitutional argument, however, because precisely the same argument was rejected in *People v. Orange* (1988), 121 Ill. 2d 364, 381, 521 N.E.2d 69, which upheld the constitutionality

of section 115.10—1. A supreme court decision is the law of the State, and it is binding on the appellate court. (*Clark Oil & Refining Corp. v. Johnson* (1987), 154 Ill. App. 3d 773, 780, 506 N.E.2d 1362, *appeal denied* (1987), 116 Ill. 2d 549.) The admission of Fortune's grand jury testimony was proper.

Blake next argues that the trial court erred in permitting Detective Cegieski to testify to statements made to the police by Frank Fortune because the contents of the interviews constituted inadmissible hearsay and were offered to impeach without proper foundation. Blake argues that the testimony lacked proper foundation because Fortune had not been questioned about the time, place, or persons involved in the interviews. (*People v. Powell* (1973), 53 Ill. 2d 465, 473, 292 N.E.2d 409.) The State responds that the testimony of Detective Cegieski was not offered to impeach Fortune but rather to explain the circumstances surrounding the police interrogation of Fortune: to show that Fortune was not, as he testified, coerced, but rather cooperated with the police and passed up the opportunity to exculpate Blake. The contents of the interview were, the State contends, rebuttal of allegations of police coercion. The State also contends that even if the contents of the interviews were admitted in error, the error was harmless given overwhelming evidence of guilt, citing the evidence listed above.

In the instant case, there appears to be but slight difference between impeachment, that Fortune was not a credible witness, and rebuttal, that Fortune was not, as he testified, coerced to incriminate Blake. However, if hearsay evidence is offered for some reason other than to adduce the truth of the matter asserted, it is admissible. (*People v. Albanese* (1984), 102 Ill. 2d 54, 70, 464 N.E.2d 206, *cert. denied* (1984), 469 U.S. 892, 83 L. Ed. 2d 205, 105 S. Ct. 268.) The admission of the contents of the police interviews of Frank Fortune was therefore proper.

Blake next argues that the trial court erred in denying a motion to suppress his custody statements because he was under the influence of drugs while in custody and incapable of knowingly and intelligently waiving his *Miranda* rights. Blake asserts that he had used heroin twice on November 22, once in the morning and once shortly before he was arrested. In the hearing on the motion, Blake testified to feeling the effects of the drugs and gave conflicting accounts of the events of November 22, which he argues was the result of a mind fogged by drugs. The State responds that the circumstances indicate that Blake's statements were admissible because they were voluntary and not induced by the drugs. See *People v. Madden* (1986), 148 Ill.

App. 3d 988, 501 N.E.2d 1297, *appeal denied* (1987), 113 Ill. 2d 581.

■■ Taking into account that the only evidence concerning Blake's condition during the interviews came from the police officers, the totality of circumstances indicates that Blake was alert and effectively waived his rights. Approximately six hours elapsed between Blake's arrest at about 3:30 p.m., and his interrogation, beginning at about 9 p.m. Blake was read his rights when he was arrested and interrogated three times after 9 p.m. Each time interrogation began, Blake was reminded that his rights remained in effect. Police testified that during questioning, Blake appeared alert, calm, and responsive, and this testimony is rebutted by no evidence other than Blake's testimony in the suppression hearing. Blake read, corrected, and signed the statement taken by the police. Blake also made several contradictory but exculpatory statements concerning the events of November 22. Some of the versions were so improbable that they were conceded as untrue. But the versions were detailed, adding to the perception that Blake was not influenced by drugs when he was interrogated. The Statements made by Blake while in police custody were made lucidly and voluntarily. The motion to suppress was properly denied.

■■ Blake argues, finally, that the trial court erred in denying his motion to quash his arrest because the police arrested him without probable cause. When police arrived at 6818 Normal, they determined that the victims had been beaten with a crowbar and that the scene of the crime was quite bloody. Blake had been described to police as someone who had been in the building earlier in the day. Blake appeared before the victims had been removed, matching the description given, and with what police perceived as fresh blood on his jacket.

Blake contends that matching the description and having blood on his jacket was not sufficient to establish probable cause, citing *People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 181, 107 S. Ct. 1329. But given the circumstances, the proximity to the crime, the apparently short time frame between the commission of the crime and Blake's arrest, and the fact that the police believed the bloodstains on the jacket to be fresh, the finding of probable cause was not manifestly erroneous. Thus the motion to quash was properly denied.

In conclusion, four of the six issues raised by Blake attack general objections that were sustained by the trial court. The remaining issues attack the trial court's denial of the motion to quash and suppress. With respect to the evidentiary rulings, the primary difficulty with review is that no specific grounds for the objections were stated. A fair reading of the record, however, shows sufficient bases to sustain the

objections, with neither error nor prejudice to Blake. With respect to the denial of the motions to quash and suppress, it is clear that the police acted with probable cause when they arrested Blake and that the statements Blake made while in custody were made voluntarily and with a knowing and intelligent waiver of rights. The conviction and sentence of Jeff Blake are therefore affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.