THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEPHEN McMURTRY, Defendant-Appellant.

First District (6th Division)   No. 1—93—3791

Opinion filed April 26, 1996.

James Geis Law Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant Stephen McMurtry was convicted of first degree murder. He was subsequently sentenced to 30 years in the Illinois Department of Corrections. Defendant appeals.

It is undisputed that on May 17, 1992, at approximately 12:30 a.m., a group of people including defendant and the victim, Ortagus Turner, were standing in front of defendant's home while defendant was engaged in an argument with another individual, Termain Tims. It is also undisputed that a bullet from the gun defendant was hold-

ing struck Turner in the chest and killed him. On appeal, defendant contends: (1) the trial court erred in allowing the State to impeach its own witness, Cordell Felix; (2) the State committed error when it urged the jury to consider Felix's prior inconsistent statement as substantive evidence of defendant's intent; (3) the trial court erred when it allowed the State to introduce a prior consistent statement of another witness, Walter Murray; (4) the trial court abused its discretion when it would not allow defense counsel to cross-examine Murray about a conversation between defense counsel and Murray the previous day; (5) the State violated an order *in limine* during closing argument; and (6) the sentence was excessive.

The following relevant facts were adduced at trial. Cordell Felix testified that at approximately 12:30 a.m. on May 17, 1992, he and his girlfriend at the time, Lavelle Charles, walked towards her home at 1927 Ashland Avenue in Chicago Heights. Standing in front of the home already was a group consisting of Termain Tims, Reginald Tims, Vernell Carmichael, and Ortagus Turner. Just as Felix and Lavelle walked up, two of her brothers, defendant and Sean Charles, pulled into the driveway in a car. Defendant and Sean went into the house and when they came back out, they began arguing with the Tims brothers. Felix testified that defendant "was ranting and raving, constantly arguing at that point." Defendant then went into the house again.

Felix testified that when defendant came outside again, he had a chrome-plated silver pistol in his hand. At that time, Felix was sitting on the back of a car with Turner. Defendant was again "talking and arguing," and he was directing his attention to Termain Tims. Felix was not sure what defendant was saying to Termain, but the argument seemed to be about an earlier dispute. Defendant may have been angry about something being taken from him.

Felix testified that defendant was moving around the driveway while "constantly arguing" with Termain, who was also known as "Herk." According to Felix, defendant yelled, " 'Herk, shut the "F" up,' " and "at that point, the gun went off." When the gun went off, Felix was facing the house, defendant and Sean were in front of Felix, Turner was directly to Felix's right, and Herk was at a diagonal to Felix's right, about three to four feet away. The following exchange then took place between the prosecutor and Felix:

"Q. Okay; what do you recall the defendant saying prior to the gun going off to Herk?

A. 'Shut the "F" up, Herk,' [and] the gun went off.

Q. The defendant say he was going to shoot anyone while you were there?

A. No, he did not.

Q. The defendant say he was going to hurt anyone prior to the gun going off?

A. Not that I recall."

Felix further testified that since the incident he had married defendant's sister Lavelle. Felix also agreed that he had talked to the police after the incident. Defense counsel then objected on the basis that the State was apparently going to impeach its own witness. Following a sidebar, the court overruled the objection. Felix then testified that he did have a conversation with a police officer approximately one-half hour after the shooting, but he did not tell the officer that defendant stated that someone was going to get shot if he did not get his stuff back. Felix testified that the police did not ask him what defendant was saying when he came out of the house. The prosecutor again asked Felix if he recalled what defendant said prior to the shooting, and Felix responded, "After he was ranting and raving, arguing with Herk, which is Termain Tims, at this point, with the gun in his hand, he said, 'Shut the fuck up, Herk,' and the gun went off."

On cross-examination, Felix testified that no words were exchanged between defendant and Turner during the incident. He testified that defendant waved and "flashed" the gun around for at least five minutes during the argument. During that time, he did not see defendant point the gun at anyone or take aim at anyone. When the gun went off, Felix was not looking at it. The whole argument took from 15 to 20 minutes, and defendant had the gun for approximately five to seven minutes.

The State next called Walter Murray. Murray testified that on May 17, 1992, at approximately 6 a.m., defendant came to his house and asked if he could stay there. Murray told defendant that he could not stay at his house but that he could go with Murray to Murray's girlfriend's home. Murray and defendant then walked together to Murray's girlfriend's house and, along the way, defendant told him that he didn't try to shoot Turner, he tried to shoot Herk.

On cross-examination, Murray testified that he had only one conversation with defendant about the shooting. When asked by defense counsel whether there was anyone else there, Murray stated that he thought there was someone else in the room. The following exchange then took place:

"Q. In the room?

A. Yeah.

Q. You had this conversation with Mr. McMurtry and you think there was someone else in the room when you had the conversation?

A. Right, I think he was talking to someone else about it.

Q. You don't remember who it was.

A. No, I do not.

Q. Now, when you testified on direct examination a minute ago, I thought you told us, correct me if I am mistaken, that Mr. Mc-Murtry made that statement to you while the two of [you] were walking over to your girlfriend's house?

A. Yes, but I didn't talk to him about it no more."

Defense counsel continued to ask Murray where his conversation with defendant occurred. Murray was also asked whether he told a detective that he and defendant were dropped off at his girlfriend's house and that the conversation occurred there, and he responded that he did not remember. Later, during cross-examination, the following exchange took place:

"Q. Do you remember [defendant] saying he tried to shoot Herk?

A. I don't remember.

Q. Do you remember him saying he shot Herk?

A. No.

Q. Do you remember him saying he didn't mean to shoot Tagus, if anybody got shot, it should have been Herk?

A. I am saying that.

Q. You do recall that?

A. Yeah.

Q. So let me try to get this straight. He never told you he aimed at Herk?

A. He didn't say that.

Q. He never told you that he shot at Herk.

A. He never said he shot at Herk.

Q. He never told you he tried to shoot Herk?

A. Said I didn't mean to shoot Tagus.

Q. Right?

A. He meant to shoot Herk and I ain't saying he pointed the gun at Herk, he said he should have shot Herk.

Q. Should have shot him is what you say?

A. (No audible response)

Q. I am really not trying to confuse you. I am trying to get, did he say he should have shot Herk?

A. I didn't say that. He said he didn't try to shoot Tagus, he tried to shoot Herk."

Murray then testified that the conversation happened 14 to 16 months ago, and he stated, "Let me put it like this. I don't got a good memory."

On redirect examination, Murray testified that he was still friends with the defendant. When asked whether he testified in front

of a grand jury on May 21, 1992, he responded, "Yes." A sidebar then occurred, during which the attorneys argued over whether the State could introduce a prior consistent statement made by Murray in front of the grand jury. The trial court found that cross-examination had created "the impression of a recent fabrication" and, therefore, over defense counsel's objection, ruled that the State could "put in a prior consistent statement." The prosecutor then asked Murray if he had told the grand jury that defendant said he did not mean to shoot Turner, he meant to shoot Herk. Murray agreed that he had. On re-cross-examination, Murray also agreed that he had told the grand jury that this conversation occurred after he and defendant got to his girlfriend's house.

The State then indicated that it would call one more witness to perfect the impeachment of Felix. Detective Jeffrey Goss testified that he worked for the Chicago Heights police department, and on May 17, 1992, he had a conversation with Felix. Goss testified that in his squad car, Felix told him that defendant was yelling about some stuff he was missing and that, if he did not get it back, someone was going to get shot. The State then rested.

The defense called Detective Goss as its only witness. Goss testified that Murray told him that at around 6:30 a.m. on May 17, defendant came to Murray's house, the two of them then were dropped off at Murray's girlfriend's house and, after going inside, they had a conversation about the shooting. The defense then rested, and the attorneys gave closing arguments. At one point during closing argument, the prosecutor stated:

> "[Y]ou heard from Detective Goss, that day of the incident Detective Goss talked to Cordell Felix, and he stated that the defendant came out and said, 'If I don't get my shit back, I'm going to shoot somebody.' That shows his intent, what the defendant was out there to do."

The jury was instructed on first degree murder and involuntary manslaughter. Defendant was convicted of first degree murder and subsequently sentenced to 30 years in prison.

Defendant's first three contentions can be summarized as follows. Defendant argues that Felix's prior inconsistent statement was improperly admitted, that the State improperly urged the jury to consider Felix's prior inconsistent statement as substantive evidence during closing argument, and that Murray's prior consistent statement was improperly admitted.

The State responds that defendant has waived all three of these arguments. The State argues that the issue of whether the trial court erred in allowing the State to impeach Felix was waived because

while defense counsel objected, the argument was not included in defendant's post-trial motion. Even if this issue was not waived, the State argues that the impeachment was proper. The State concedes, however, that the prosecutor improperly referred to Felix's inconsistent statement as substantive evidence and that the trial court erred in admitting Murray's grand jury testimony. Nevertheless, the State argues, these were harmless errors and the issues were waived. The State points out that defense counsel neither objected during closing argument nor included the argument concerning the prosecutor's statements in defendant's post-trial motion. The State also points out that while defense counsel objected to the admission of Murray's consistent statement, the issue was not included in the post-trial motion.

■ The State is correct in asserting that to preserve an argument for appeal, both objection at trial and a written post-trial motion raising the issue are required. *People v. Ward*, 154 Ill. 2d 272, 609 N.E.2d 252 (1992); *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988); 134 Ill. 2d R. 615(a). The plain error doctrine, however, is an exception to this general rule. *Enoch*, 122 Ill. 2d at 189, 522 N.E.2d at 1131. Plain error encompasses those errors which are obvious, which affect substantial rights of the accused, and which, if uncorrected, would be an affront to the integrity and reputation of the judicial system. *People v. Campbell*, 264 Ill. App. 3d 712, 636 N.E.2d 575 (1992). The plain error rule applies where evidence is closely balanced, or where error is of such magnitude that commission thereof has denied the accused a fair and impartial trial or may have significantly affected the outcome of the case. *Ward*, 154 Ill. 2d at 294, 609 N.E.2d at 260; *People v. Smith*, 141 Ill. 2d 40, 565 N.E.2d 900 (1990); *People v. Rivera*, 277 Ill. App. 3d 811, 661 N.E.2d 429 (1996). Hearsay violations have been reviewed as plain error. *People v. Singletary*, 273 Ill. App. 3d 1076, 652 N.E.2d 1333 (1995); *People v. Furby*, 228 Ill. App. 3d 1, 591 N.E.2d 533 (1992). Also, multiple errors not properly preserved for appellate review can amount to plain error and require reversal for a new trial if "[t]hese errors, when considered together, undermined the fundamental fairness of the trial." *Rivera*, 277 Ill. App. 3d at 823, 661 N.E.2d at 436.

In the present case, it was undisputed that the victim was struck and killed by a bullet that came from the gun that defendant was holding. The State's main challenge, therefore, was to prove beyond a reasonable doubt that defendant had the criminal intent necessary to be convicted of first degree murder. Put another way, the crucial issue at trial was intent, and as defendant points out, his first three contentions directly involve all of the evidence the State presented on the issue of intent, namely, the testimony of Felix and Murray.

We conclude that the plain error doctrine applies here. The testimony and argument defendant disputes in his first three assignments of error should not have been presented to the jury and surely could have affected the outcome of the case. Added together, these errors have deprived defendant of his right to a fair and impartial trial.

■ Defendant's first assignment of error is that the trial court improperly allowed the State to introduce a prior inconsistent statement of Felix, the State's own witness. In *People v. Weaver*, 92 Ill. 2d 545, 442 N.E.2d 255 (1982), the supreme court faced a similar argument, and the court dictated under what circumstances a party can introduce a prior inconsistent statement. The court stated:

> "A court's witness, or any other witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." *Weaver*, 92 Ill. 2d at 563-64, 442 N.E.2d at 262-63.

The *Weaver* court went on to find that by admitting a prior inconsistent statement of its own witness who had disappointed the prosecution but had not damaged the State's case and had actually testified favorably, the State committed reversible error. This error was compounded by the State's reference to the prior inconsistent statement as substantive evidence in closing argument. *Weaver*, 92 Ill. 2d at 564, 442 N.E.2d at 263.

Defendant argues that, under *Weaver*, the trial court here erred in allowing the State to impeach Felix. We agree. Felix was the only witness at trial who was present during the shooting, and he actually testified favorably for the State. He named the people at the scene, he described the argument between defendant and Termain Tims, and he verified that defendant was the person who shot the victim. His testimony was not more damaging than his complete failure to testify would have been. Although the State relied on Felix to testify that just before the gun went off, defendant said that someone was going to get shot, this did not serve as a justification for bringing otherwise inadmissible hearsay to the jury's attention. Under *Weaver*, the trial court improperly allowed the State to introduce Felix's prior inconsistent statement and the court erred in allowing the State to perfect this impeachment through the testimony of Detective Goss.

■ Moreover, as in *Weaver*, the State then went on to refer to the prior inconsistent statement as substantive evidence during closing argument. This is defendant's second contention, and the State concedes this was improper. The State argues, however, that the prosecutor committed harmless error. We disagree. The crucial issue at trial was intent, and after telling the trial court that its only reason for calling Goss was to perfect the impeachment of Felix, the State then went on to tell the jury:

> "[Y]ou heard from Detective Goss *** that the defendant came out and said, 'If I don't get my shit back, I'm going to shoot somebody.' *That shows his intent ****." (Emphasis added.)

It is unlikely, as the State urges, that the trial court's standard instruction on impeachment could have cured any harm or prejudice caused by the above comments. The prosecutor clearly took advantage of evidence admitted for a limited purpose, and in our opinion, admitted erroneously, and used it in a prejudicial and impermissible manner. We disagree that the potential prejudicial impact of this could so simply have been erased from the jurors' minds.

■ Added to these errors is the trial court's ruling that Murray's prior consistent statement given in front of the grand jury was admissible to rebut the impression of a recent fabrication. The State concedes that this ruling was also erroneous, but again argues that it was harmless. We cannot agree. While this error committed alone may not have required reversal, as defendant argues, the cumulative effect of admitting the prior inconsistent statement of Felix, using that statement as substantive evidence, and also admitting the prior consistent statement of Murray has deprived defendant of his right to a fair and impartial trial. In trying to convince the jury that defendant had the requisite intent necessary to commit first degree murder, the State effectively based most of its case on inadmissible hearsay and impeachment evidence later referred to as substantive evidence of defendant's intent. For these reasons, we reverse and remand for a new trial.

We reverse and remand based on defendant's first three assignments of errors. We will also briefly comment on one other argument made by defendant since it may recur in a new trial.

Defendant contends that the trial court abused its discretion when it would not permit defense counsel to cross-examine Murray about a conversation that allegedly occurred between defense counsel and Murray the previous day. At a sidebar, defense counsel said he was willing to testify if necessary to prove up his impeachment of Murray. The trial court denied the request, stating that it did not want defense counsel to interject himself into the trial. Defense

counsel then asked the court if he could at least cross-examine Murray about the content of the conversation and the defense "would be stuck with the answer." The trial court refused this request also.

■ It is within the trial court's discretion to refuse to permit an attorney to testify. *People v. Blake*, 179 Ill. App. 3d 249, 534 N.E.2d 415 (1989). Also, the latitude of cross-examination is left to the discretion of the trial court. *People v. Patterson*, 154 Ill. 2d 414, 610 N.E.2d 16 (1992). We cannot say that the trial court's refusal to allow defense counsel to testify amounted to abuse of discretion. Nevertheless, this court does not see the harm that would have been caused in at least allowing defense counsel to inquire about the content of the conversation he had with Murray the previous day.

For the reasons stated, the judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

EGAN and RAKOWSKI, JJ., concur.