THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN SHLIMON, Defendant-Appellant.

First District (6th Division)   No. 1—90—3112

Opinion filed July 17, 1992.

John Thomas Moran, Jr., of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Laura Bertucci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, John Shlimon, was found guilty of murder and was sentenced to a 50-year term of imprisonment.

Defendant appeals, contending that: (1) he was not proved guilty beyond a reasonable doubt; (2) the State's repeated references to gang membership, symbols and signs were unduly prejudicial to defendant; (3) the State's closing argument emphasizing defendant's gang membership pandered to the jury's fear of gangs; (4) defendant was denied effective assistance of counsel; (5) the trial court improperly considered at sentencing defendant's involvement in a gang-related incident while incarcerated; and (6) the 50-year sentence is excessive.

The record reveals that on the evening of September 15, 1989, the deceased, Peter Coma, age 17, organized a dance with some friends at a club located in Chicago. Admission was charged to enter, and approximately 250 teenagers were in attendance. Around 9 p.m., a fist fight developed between two boys inside the dance hall. The dance organizers directed the boys to leave the hall, and the fight resumed in the parking lot directly across the street. Other teenagers then joined in the fight. As the organizers attempted to quell the melee, the deceased was shot in the head. Three days later, defendant surrendered to the police.

Patrick Michael, age 17 at the time of the shooting, testified that the deceased was his best friend. Michael, who was also one of the organizers of the dance, testified that the deceased arrived at the dance hall around 8 p.m. At 9:15 p.m., a fight developed between two rival gang members inside the dance hall. After the fight broke up, the two members involved in the altercation were told to leave and not start any trouble.

At the time the two gang members were ejected from the dance hall, approximately 50 people were standing outside waiting to enter the building. Michael walked to the area where the crowd was waiting. At that moment, Michael's friend, Sargon Bablonejad, arrived. Michael saw the two people who were previously involved in the fight walk into the street. More people arrived and began shouting gang slogans, such as "King love, Royals." A larger fight involving approximately 20 people began in the parking lot across the street from the dance hall.

Michael recognized defendant, whom he had known for 18 months, as one of the participants in the fight. Michael began escorting all the people waiting in line to the inside of the building so that no one would get hurt. The fight continued for approximately 15 minutes. The fighters then dispersed. As defendant ran towards a waiting car, Michael followed closely behind. He told defendant to forget about the fight and leave the premises. Michael then headed toward

the rear parking lot of the dance hall, and together with the deceased, tried to gather more people inside the building.

Defendant entered the driver's side of a small two-door, gold Cutlass automobile, approximately two or three car lengths away from Michael, and four to five car lengths away from the deceased. Defendant was sitting on the driver's side windowsill of the car, with his body leaning out and his feet inside the car. As defendant extended his hand, Michael saw that he held a gun. Michael began screaming at defendant to forget the incident and leave. Michael continued advancing toward the car, which was slowly moving away. He heard the click of the gun and defendant laugh, but thought that he was joking. Upon hearing another gunshot, Michael saw sparks flying from the gun as defendant sped off down the street.

A few persons in the crowd began screaming that the deceased had been hit. Michael found the deceased lying on his back, bleeding from his head. The police arrived. Michael named defendant as the shooter and told police that defendant was approximately 5 feet 10 inches tall, wore a goatee, and had a blue and white bandana around his head. Defendant was dressed in a green and blue checkered shirt with a gray undershirt and dark trousers and gym shoes. Michael stated that he was about two car lengths away from defendant's car for approximately five seconds. Defendant was the only person hanging out of the car when Michael saw the sparks fly after the gun was fired.

Bablonejad, age 19, testified that he arrived at the dance hall at 8 p.m. According to Bablonejad, neither he, Michael, nor the deceased was a member of any gang. Bablonejad was outside the dance hall at 9 p.m. when he saw a group of people being pushed outside the building. It was his intention to break up any fights. He knew the fight was among rival gang members, the Latin Kings and the Simon City Royals. The deceased had also come downstairs to break up the fight.

Bablonejad noticed defendant, whom he had seen on numerous occasions and knew as a neighborhood acquaintance. Bablonejad stated that on the night of the murder, defendant had a goatee, wore a blue and white bandana around his head, and was dressed in a flannel shirt with a gray undershirt. Defendant walked towards him and made a hand signal that he recognized as a sign of the Latin Kings. Bablonejad saw that defendant carried a gun in the waistband of his pants.

Defendant entered a car that was pulled around the alley on the east side of the building. Bablonejad was walking behind Michael and saw the deceased also standing in the vicinity of the car. Defendant was sitting on the door of the driver's side, with half of his body

hanging outside the car, when he pulled out his gun. Bablonejad and Michael asked defendant to leave the area because they did not want any trouble. Bablonejad saw defendant point the gun towards the crowd. After the gun clicked, defendant began laughing. The second shot struck the deceased. Bablonejad drove to the deceased's parents' home and informed them that the deceased had been shot. Two days later, Bablonejad identified defendant at a lineup.

Detective James Spencer of the Chicago police department, together with Detectives Louis Wachtovic and Andy Sobolewski, were assigned to investigate the homicide of the deceased. Sobolewski learned from Michael that defendant had leaned out of the passenger window of a car and had shot the deceased. In the following days, the officers attempted to locate defendant.

Three days after the shooting, defendant's attorney contacted the police and turned defendant over to police custody. Defendant was placed in a lineup that evening, and Bablonejad identified him as the shooter. Spencer testified that Bablonejad told him that defendant fired the gun from the passenger window.

Rhonda Malone, age 17, testified for defendant that on the night of the offense at approximately 9:15 p.m., she was driving a black Pontiac Grand Am with her friend, Angelic Tedder. Malone saw defendant in front of the dance hall, together with another friend named Romeo. Malone called to defendant and Romeo and they entered her car. She drove defendant to an intersection approximately 2½ miles away. Malone had not met defendant prior to the night of the offense and could not describe what he was wearing. Romeo told Malone two months prior to trial that defendant had been arrested for murder. Romeo told her that he heard the report of a gunshot during the fight. According to Malone, defendant was not holding a gun in his hand.

Tedder, age 15, also testified as a defense witness. Tedder's testimony essentially paralleled that of Malone. Tedder stated that defendant and Romeo entered Malone's car and that they were not carrying guns nor did they fire any shots from the car window. Tedder could not remember the clothes defendant wore on the night of the shooting.

The jury found defendant guilty of murder. At the sentencing hearing, the State presented the following evidence as aggravation: that defendant was on probation at the time of the shooting for robbery and that he had "numerous contacts with the law, some of them gang related." Additionally, the State informed the court that a report had been filed by the Cook County Department of Corrections

that defendant was involved in an incident in the jail in which an inmate received a tattoo for the Latin Kings. Defendant decided that the tattoo should be removed and proceeded to use a hot iron to burn the tattoo off the inmate's arm. The report was not introduced into evidence at trial.

On appeal, defendant first asserts that he was not proved guilty beyond a reasonable doubt. Specifically, defendant argues that the State's case consisted solely of the two occurrence witnesses, Michael and Bablonejad, and that their opportunity to observe was limited because the shooting was at night and the street was illuminated only by residential streetlights. Defendant also points out that Michael told the police that he saw defendant fire a gun at the deceased, but testified at trial that he did not see the gun fired. Defendant further contends that Michael and Bablonejad contradicted each other on relevant parts of their testimony.

The critical inquiry on review of a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.) Once defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that, upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Migliore* (1988), 170 Ill. App. 3d 581, 525 N.E.2d 182.

The test of a positive identification is whether the witness had an opportunity to view the offender for a sufficient length of time under conditions adequate for observation. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743; *People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179.) These conditions need not be perfect and the observation need not be prolonged. *People v. Palmer*, 188 Ill. App. 3d 414, 545 N.E.2d 743; *People v. Williams* (1986), 143 Ill. App. 3d 658, 493 N.E.2d 362.

In this case, we are not persuaded by defendant's assertion that he was not proved guilty beyond a reasonable doubt. Both Michael and Bablonejad recognized defendant, whom they had known for some time through a neighborhood acquaintanceship, as one of the participants in the fight. They held a brief conversation with defendant in which they told him to leave the premises and forget about the fight. Both witnesses immediately told the police that defendant was responsible for the shooting and never wavered in their identification of defendant as the shooter. Michael and Bablonejad were consistent

in their initial description of defendant's appearance and also in their identification of him in the lineup.

The jury had the opportunity to assess the credibility of the two identification witnesses, Michael and Bablonejad, as well as that of the two defense witnesses, Malone and Tedder. We do not believe that simply because the shooting occurred at night under the illumination of residential streetlights the eyewitnesses were unable to identify defendant. Nor do we find that inconsistencies in the eyewitnesses' testimony render their testimony unbelievable.

Relatedly, defendant argues that the State's failure to produce other occurrence witnesses from the crowd outside the dance hall created an inference that defendant was not the shooter. However, the State is not obligated to produce every witness to a crime. (*People v. Smith* (1971), 3 Ill. App. 3d 64, 278 N.E.2d 551.) In this case, the testimony of Michael and Bablonejad, in conjunction with that of Officers Spencer and Sobolewski, was more than adequate to prove defendant's guilt. Accordingly, we reject defendant's assertion that he was not proved guilty beyond a reasonable doubt.

We turn now to defendant's contention that the State's introduction of evidence of defendant's alleged gang membership was highly prejudicial where there was no proof that such membership was actually related to the crime charged.

Evidence of gang membership is admissible where there is sufficient proof that such evidence is related to the crime charged. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840; *People v. Anderson* (1987), 153 Ill. App. 3d 542, 505 N.E.2d 1303.) Evidence of gang membership may be used to show motive for the commission of the offense, thus tending to identify a particular person as the offender. (*People v. Rivera* (1986), 145 Ill. App. 3d 609, 495 N.E.2d 1088; *People v. Orr* (1986), 149 Ill. App. 3d 348, 500 N.E.2d 665.) In *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864, our supreme court determined that gang-related evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. The court characterized relevant evidence as that which has a tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *People v. Gonzales*, 142 Ill. 2d 481, 568 N.E.2d 864.

In the present case, defendant argues that because the deceased was not a gang member, any evidence of gang affiliation was unrelated to the shooting of the deceased and did not establish a motive. However, the evidence established that members of both the

Latin Kings and the Simon City Royals were present at the dance. About 9 p.m., members of the two rival gangs began fighting inside the hall. After the organizers ordered the fighters to leave the dance, the fight resumed in the parking lot where additional gang members, including defendant, joined in the altercation. Bablonejad testified that defendant made a hand signal that he recognized as a sign of the Latin Kings, thereby supporting an inference that he was, in fact, a gang member. When the deceased, Michael and Bablonejad attempted to break up the fight, defendant became angered and fired shots at the crowd. As such, we find that reference to gangs as well as defendant's gang affiliation was inevitable under the circumstances. This evidence provided proof that defendant's gang membership, and his participation in the fight with the rival gang, was substantially related to and established a motive for the shots fired into the crowd which struck the deceased.

Defendant next assigns as reversible error comments made by the prosecutor in closing and rebuttal arguments concerning defendant's gang membership and gang-related activities that pandered to the juror's fears. During closing argument, the prosecutor argued:

"Imagine the courage it took for Patrick Michael and Sargon to get up on that stand, relive that moment, point the finger at that man and identify him as the shooter, knowing he is a gang member. Think of how each and every one of you felt when your name was called off and you sat in those chairs and the Judge asked you questions about your personal selves. Think how nervous you were and possibly how frightened you were, knowing that you could potentially be deciding a murder case."

Defendant also argues that the State elicited testimony from Michael that he was so threatened by gang reprisals that he left high school and went to live with relatives in California, and later moved to London out of fear for his safety. In addition, the prosecutor commented that the jury should tell defendant that he is "not going to intimidate you. And you can tell him that by coming back and telling him that he is guilty of the first degree murder of [the deceased]."

Defendant cites *People v. Mullen* (1990), 141 Ill. 2d 394, 566 N.E.2d 222, as support for his position that prosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any evidence in the record, are highly prejudicial and inflammatory. The State counters that defendant has waived this issue on appeal by failing to make any objections at trial and by failing to raise the issue in

his post-trial motion. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

■ We concur with defendant that the remarks made by the prosecutor were inappropriate and constitute error. Having so decided, we must determine whether the prosecutorial comments were so egregious that we need invoke the plain error doctrine. The plain error doctrine may be applied when the evidence is so close that there is a possibility that an innocent man may have been convicted due to an error which is obvious from the record, or the alleged error deprived the accused of substantial means of enjoying a fair and impartial trial. *People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743.

In this case, we do not find that the evidence was so closely balanced that application of the plain error doctrine is warranted. Michael and Bablonejad both testified that defendant was a participant in the gang fight which occurred in the parking lot moments before the deceased was shot. They saw defendant leave the fight and head toward the Cutlass automobile. Bablonejad testified that defendant carried a gun in his waistband. Both witnesses testified that they saw defendant lean from the window ledge of the car, aim his pistol toward the crowd, and fire two shots. Finally, Michael and Bablonejad knew defendant and were consistent in their identification of defendant as the perpetrator of the offense. Accordingly, we find no reason to invoke the plain error doctrine because of the improper prosecutorial comments during closing argument.

Defendant further argues that he was inadequately represented by counsel because defense counsel failed to bar testimony concerning defendant's gang activity, lineup identification procedures, and failure to submit voluntary and involuntary manslaughter instructions to the jury, and to argue about defendant's potential for rehabilitation in view of the fact that he was only 17 years old at the time of the shooting.

In order to prevail upon a claim of ineffective assistance of counsel, defendant must prove that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for defense counsel's alleged errors, the outcome of the proceeding would have been different. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) There is a presumption that counsel's conduct falls within the range of reasonable professional assistance. *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 492 N.E.2d 600.

■ We do not believe that defense counsel's failure to file a motion *in limine* to bar testimony about defendant's gang activity rises to the level of a cognizable claim for ineffective assistance of counsel because it would have been properly denied. As previously discussed, the facts in this case were such that reference to defendant's gang affiliation was unavoidable. An attorney's decision to file or not to file a motion is regarded as a matter of trial strategy (*People v. Green* (1967), 36 Ill. 2d 349, 351, 223 N.E.2d 101), which must be given great deference. (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Similarly, decisions concerning defense counsel's choice of jury instructions, lineup identification procedures and argument concerning defendant's potential for rehabilitation can also be characterized as tactical decisions within the judgment of defense counsel. When counsel is planning a trial strategy, judgments must be made and any errors in judgment do not constitute ineffective assistance of counsel. *People v. Stewart* (1984), 104 Ill. 2d 463, 473 N.E.2d 1227.

We do not believe that the outcome of the trial would have been different if the alleged errors defendant alludes to had not been made. Accordingly, defendant's claim for ineffective assistance of counsel must fail.

■ Defendant next contends that he is entitled to a new sentencing hearing because the State introduced in aggravation testimony about an incident that defendant was involved in while awaiting trial. Specifically, the State informed the trial judge that it had a report from a jail investigator that defendant had participated in the gang-related burning of a tattoo off another inmate. We find, however, that defendant's failure to object to the introduction of this testimony at trial or in his post-trial motion results in waiver. *People v. Clark* (1987), 160 Ill. App. 3d 877, 513 N.E.2d 937.

Finally, defendant contends that the 50-year sentence is excessive. Defendant argues that because he fired random shots into a crowd of people, his actions do not demonstrate a calculated murder. Further, because he was 17 years old at the time of the offense, his potential for rehabilitation was not given adequate consideration.

■ It is well established that the trial court has wide discretion in sentencing and is in a superior position to determine what is proper, and that we may not substitute our judgment merely because the factors to be considered might have been balanced differently. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Del Percio* (1983), 118 Ill. App. 3d 539, 454 N.E.2d 1169.) The sentence imposed by the trial judge was within the statutory range for

first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)) of not less than 20 nor more than 60 years. In light of defendant's history of criminal activity, we do not find the judge abused his discretion in imposing sentence in the present case.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.