THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILFREDO RIVERA, Defendant-Appellant.

First District (1st Division)    No. 1—93—4594

Opinion filed January 29, 1996.

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

On September 27, 1992, Juan Garcia was brought into the emergency room of Christ Hospital. He had been shot in the head. The bullet had entered his right temple, passed through his brain, and lodged under his skin over the left temple. He was in a coma. Surgery was performed immediately. He survived and eventually testified at the jury trial of Wilfredo Rivera, the man accused of being legally responsible for shooting him.

Rivera was found guilty of aggravated battery with a firearm. He was sentenced to 10 years in the Illinois Department of Corrections. He raises several issues in support of his contention that he did not receive a fair trial.

We find the jury heard testimony and argument that deprived the defendant of a fair trial. We reverse his conviction and remand the cause for a new trial.

EVIDENCE AT TRIAL

Juan Garcia testified that on September 27, 1992, he was at 8812 Houston. He got shot in the head as he was getting in a car. He did not have anything in his hands at the time. When asked who shot him, Garcia did not respond. Garcia identified defendant as someone who "was out there when [he] got shot." Garcia had seen the defendant before on the street, but did not know how many times. At the time of the shooting Garcia had been a member of the Spanish Gangster Disciples for three years.

On cross-examination, Garcia said that before testifying he had been told where the defendant would be seated in the courtroom. Garcia did not remember what he was wearing when he got shot, what kind of car he was getting out of, or whether any of the assailants had glasses, beards, or mustaches. The people who shot him were six feet away. There were five of them.

James Lindsey testified on behalf of the State. Lindsey is not a member of any of the common Chicago street gangs because he had "a bunch of relatives" "in just about every gang in Chicago," and if he joined one gang he would "get in lots of trouble with the relatives." Lindsey was familiar with some of the customs of the various gangs. Lindsey identified pictures of the area in which the shooting took place. He identified graffiti on the buildings which depicted the initials S.G.D., representing Spanish Gangster Disciples, as well as an upside down crown, a sign of disrespect to the Latin Kings.

Lindsey was on the 8800 south block of Houston at approximately 1 a.m. on September 27, 1992. As Garcia was getting out of a friend's car, a group of four to five young Hispanic men approached, yelling gang signs. The men were yelling "King Love" and "DK," which stands for "Disciple killer." The men were "throwing up a crown," which means they were making a hand signal which stands for Latin Kings. The group came to the corner of 88th and Houston and started shooting. Garcia was approximately 20 to 25 feet away from the group. Defendant was one of the members of the group.

Lindsey heard five shots, all fired by the same person. Garcia was struck in the head and went down. Although defendant did not fire the shots, defendant was standing approximately one foot away from the shooter. Defendant was making hand gestures. Garcia did not have any weapons in his hands when he was getting out of the car and he did not make any threatening remarks. The group of attackers took off running west on 88th toward Commercial Avenue. Lindsey had seen defendant before the shooting. He did not know defendant by name, but recognized him by face.

At the time Garcia was shot, Lindsey said, defendant was wearing a blue and yellow checkered flannel shirt. After Garcia was shot, Lindsey and "another guy" telephoned the police.

Approximately 45 minutes later, Lindsey saw defendant again in the back seat of a marked police car. Lindsey identified defendant as one of the participants in the shooting. Defendant was wearing a different shirt.

On cross-examination, Lindsey said that when defendant was in the police car he was wearing a blue shirt, either a Duke shirt or a Georgetown shirt. Defendant was not wearing a jacket. Defendant

was handcuffed to two other individuals. Lindsey did not remember what the other two individuals were wearing at the time.

At the time of the shooting, the group of individuals was standing within a foot of each other. Lindsey's attention was drawn to the shooter. The shooter had a small handgun. Lindsey saw defendant with "[s]omething small in his hand. It appeared to be a gun."

When asked if he gave a clothing description of anyone to the police that night, Lindsey said, "They weren't really questioning me about myself. I had other people with me when they were questioning us and I would say one thing. It was like someone else filled in the blank for me."

Lindsey has been known by the name of James Langley. On the night of the incident he did not give the police his last name. Juan Garcia was his friend at the time of the shooting. He still is his friend.

On redirect, Lindsey testified that at the time of the shooting defendant was wearing a black and gold flannel shirt. Black and gold are Latin King colors. On recross, Lindsey denied that he had testified on direct examination that defendant was wearing a blue and yellow shirt at the time of the shooting.

On September 27, 1992, Officer Millaun Brown was assigned to watch a crime scene at 8813 South Houston until the crime lab appeared. When the crime lab appeared, he and his partner went to 8756 South Houston to look for spent cartridges. He heard shots being fired from the east. He went about a block and a half to 87th and Escanaba.

Officer Brown saw four men. One of the men immediately fled. The remaining three, including defendant, were male Hispanics, between the ages of 17 and 22. Defendant was carrying a black and gold shirt.

Officer Brown took the three men into custody. He put them into the police car and drove them back to the scene. The three men remained in the car while Officer Brown had a conversation with some citizens. Based on that conversation, Officer Brown took the arrestees to the police station and turned them over to the detectives. It was approximately 2 a.m. when Officer Brown arrested defendant. Defendant was wearing a leather jacket and a baseball cap.

Detective Winistorfer was assigned to the investigation of a shooting that occurred at 88th and Houston on September 27, 1992, at approximately 1 a.m.. At approximately 4:15 a.m., Detective Winistorfer had a conversation with the defendant. Defendant told him that he had spent the evening of September 27, 1992, at his aunt's house at 84th and Burnham. Defendant did not know the address of his

aunt's house and did not know exactly what time he left, but it was between 11 p.m. and midnight. Defendant was wearing a black leather jacket with a Harley Davidson emblem, and a Bull's T-shirt. Defendant was carrying a black and yellow checkered shirt. He told Detective Winistorfer he was a Latin King.

Gunshot residue tests were taken from defendant that night. The tests were inconclusive.

The State rested.

Theresa Najera, defendant's aunt, testified that on the night of September 26 and 27 she was at the home of her sister Fabielo Fernandez. Theresa was playing cards that evening. About 30 to 35 members of her family were present, including defendant. Defendant was playing Nintendo in the attic with his cousins. He was wearing a white shirt and jeans. There was no emblem or writing on the shirt. Theresa and her sister Victoria left at approximately 1:35 a.m. Defendant had left the house between 1 and 1:15.

Rosa Gonzales, another aunt of defendant, was at Fabielo Fernandez's house the evening of September 26, 1992. She stayed until 1:30 a.m. September 27, 1992. Approximately 40 people were in the house. Rosa saw defendant at the family gathering. Rosa last saw defendant between 12 and 1. To the best of her knowledge, defendant was still at the house when she left at 1:30 a.m.

Defendant testified. On September 26 and 27 he was at his aunt Fabielo Fernandez's house all evening playing Nintendo.

After a conversation with Jose Fernandez, he left his aunt's house. It was late. He did not recall the exact time he left. Defendant went to his friend Jay Flores' house, around 80th and Baker. He stayed there about an hour. Flores gave him a jacket to put on. Defendant put on the jacket, and defendant and his friends started walking toward 103rd. They were walking east to get a ride. The police came and arrested him, slammed handcuffs on him, and threw him in the police car. The police took him back to a different location.

At the time defendant was stopped, he was wearing gray jeans, a white Bulls shirt, a black leather jacket, and a white and black baseball cap. Defendant was carrying Jay Flores' black and gold shirt. He was holding it for him. Jay Flores was with defendant when he was arrested. Defendant wore the same clothes the whole evening.

Defendant said that he did not have a gun in his possession that night. He did not shoot or attempt to shoot anyone that evening. He did not see anybody get shot that night. The police administered some kind of test to his hands.

On cross-examination, defendant said that he went to Jay Flores'

house at 81st and Baker and stayed about an hour. Defendant was carrying Jay Flores' shirt to be helpful to him. Defendant was a Latin King for two months. A crown sprayed upside down is considered an offense or disrespect to the Latin Kings. Black and gold are Latin King colors. Black and gold sweaters are war sweaters.

The defense rested.

OPINION

We limit our discussion to two of the issues raised by the defendant. Taken together, they represent an improper attempt to bolster the identification testimony offered by the State.

THE HEARSAY IDENTIFICATION EVIDENCE

On direct examination, Officer Brown said he took the defendant and two other male Hispanics into custody on 87th and Escanaba. He then drove to the scene of the shooting. The three men remained in the back seat of the police car for a brief period of time. Then:

"Q. Did you have a conversation with some citizens at 8814 Houston?

A. Yes, sir.

Q. Based on that conversation what did do you [sic] with the defendant and the two others in the squad car?

A. They stepped out of the squad car and the people said, yeh, that's them.

[Defense counsel:] Objection, judge.

[THE COURT:] Sustained to what they said. The jury is instructed to disregard."

The jury had just heard the kind of hearsay identification testimony that would affect a defendant's right to a fair trial. (See *People v. Singletary* (1995), 273 Ill. App. 3d 1076, 652 N.E.2d 1333; *People v. Lopez* (1987), 152 Ill. App. 3d 667, 504 N.E.2d 862.) Ordinarily, a trial judge's instruction to a jury to disregard something it heard would put an end to the matter. (See *People v. Jones* (1992), 153 Ill. 2d 155, 161, 606 N.E.2d 1145.) Here, the trial judge's minimal instruction to disregard may have worked had the subject been dropped for the duration of the trial. It was not dropped.

The prosecutor then asked:

"Q. Based on *that conversation* did you do anything with the defendant and the other two?

A. Yes, sir, I took them over to the area 11th, 727 east 111th.

Q. Did you turn them over to anyone there, other police personnel?

A. Yes." (Emphasis added.)

Another reminder about the stricken testimony came during the State's closing argument. The prosecutor said:

"Officer Brown wasn't there when the shooting occurred either, but Officer Brown told you he was out there covering the scene, he received information, went to a nearby location, just a couple of blocks away and Officer Brown makes an arrest. He sees these guys, brings them over there. One guy has a checkered shirt with the war colors on it. *Brings them over, has a conversation with some citizens and he runs these guys into the detectives.*" (Emphasis added.)

There was no objection to this argument. Nor did the defendant refer to the hearsay issue in his motion for a new trial. The State contends the alleged error was waived. The defendant answers that we can consider the improper hearsay under the plain error doctrine.

■ In order to preserve an error for review, a defendant must both object at trial and raise the issue in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Failure to preserve an alleged error is a "procedural default." *People v. Keene* (1995), 169 Ill. 2d 1, 16.

There are exceptions to the waiver rule. They are contained in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) and in the case law. Where errors or defects affect substantial rights, denying the accused a fair and impartial trial, or where the evidence is closely balanced, a reviewing court may choose to consider the issue. *People v. Ward* (1992), 154 Ill. 2d 272, 294, 609 N.E.2d 252; *People v. Smith* (1990), 141 Ill. 2d 40, 54, 565 N.E.2d 900; *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233.

The rule of waiver is a limitation on the parties and not on the courts, "and a reviewing court may ignore the waiver rule in order to achieve a just result." *People v. Hoskins* (1984), 101 Ill. 2d 209, 219, 461 N.E.2d 491; *Lopez*, 152 Ill. App. 3d at 676; *People v. Dickerson* (1983), 119 Ill. App. 3d 568, 571, 456 N.E.2d 920.

Hearsay violations have been reviewed as plain error. *People v. Singletary* (1995), 273 Ill. App. 3d 1076, 1084, 652 N.E.2d 1076; *People v. Furby* (1992), 228 Ill. App. 3d 1, 9, 591 N.E.2d 533.

■ We first consider whether the hearsay resulted in any error under the circumstances of this case.

The out-of-court identification testimony was contained in an unresponsive answer of a police officer. The words heard by the jury—"yeh, that's them"—go to the essence of the dispute: whether the defendant was the man who committed the crime. The prosecutor's next question, with its reference to "that conversation," and the reference to "has a conversation with some citizens" in the State's final argument, trivialized the trial judge's direction to the jury.

In *People v. Hood* (1992), 229 Ill. App. 3d 202, 593 N.E.2d 805, we found an unresponsive answer by a former prosecutor was prejudicial, even though the trial judge sustained the defense objection, instructed the jury to disregard the answer, and ordered the answer stricken from the record. We said, "The State's responsibility is not alleviated because Kogut's answer was unresponsive." *Hood*, 229 Ill. App. 3d at 214.

In a final-argument setting, we have held that sustaining objections to improper comments does not remove the taint of prejudice. *People v. Fletcher* (1987), 156 Ill. App. 3d 405, 411, 509 N.E.2d 625; *People v. Brown* (1983), 113 Ill. App. 3d 625, 629, 447 N.E.2d 1011.

In *People v. Lewis* (1995), 269 Ill. App. 3d 523, 526, 646 N.E.2d 305, a detective was asked: "Q. And after you did that, what did you do?" His unresponsive answer was: "She agreed to take a polygraph exam." The trial judge sustained the defense objection, asked the jury to disregard the answer, and struck the answer from the record. The court held reversible error took place, despite the trial judge's corrective action. "The trial court did its best to 'unring the bell,' but in this case, we conclude that the polygraph reference denied defendant his right to a fair trial." *Lewis*, 269 Ill. App. 3d at 527.

The courts have used other descriptive phrases to illustrate the point that substantial prejudice does not vanish from the human mind simply because a judge says it should: "Driving a nail into a board and then pulling the nail out does not remove the hole" (*People v. Cepek* (1934), 357 Ill. 560, 570, 192 N.E. 573); "The naive assumption that prejudicial effects can be overcome by instructions to the jury *** all practicing lawyers know to be unmitigated fiction" (*People v. Burns* (1988), 171 Ill. App. 3d 178, 185, 524 N.E.2d 1164); "To suggest that the jury disregard such explosive evidence is, in the words of Judge Learned Hand, a 'recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else' " (*People v. Hernandez* (1988), 121 Ill. 2d 293, 318, 521 N.E.2d 25, quoting *Nash v. United States* (2d Cir. 1932), 54 F.2d 1006, 1007).

No matter how we describe an out-of-court identification by people who cannot be cross-examined, the prejudice is palpable. We have so held. See *People v. Singletary* (1995), 273 Ill. App. 3d 1076, 652 N.E.2d 1333 (undisclosed confidential informant gave police defendant's first name and address); *People v. Johnson* (1990), 202 Ill. App. 3d 417, 559 N.E.2d 1041 (unknown men identified defendant as someone who ran from the scene of a burglary); *People v. Lopez* (1987), 152 Ill. App. 3d 667, 504 N.E.2d 862 (police officers testified unnamed woman and crowd of people identified defendant as the shooter when he was put into a squadrol).

Hearsay testimony identifying the defendant as the one who committed the crime cannot be explained away as "police procedure," even where the trial judge limits the evidence to a nonhearsay purpose. See *Singletary*, 273 Ill. App. 3d at 1084; *Johnson*, 202 Ill. App. 3d at 421-22.

We hold that the hearsay testimony, reclaimed by the prosecutor's next question and final argument, was error, notwithstanding the trial judge's attempt to mitigate the damage.

Whether the error should cause a reversal of the defendant's conviction is a question that must await our discussion of the next issue.

## THE PROSECUTOR'S FINAL ARGUMENT

James Lindsey was the State's identification witness. Although the victim, Juan Garcia, said the defendant was "out there" when he got shot, his testimony reflects a vagueness of recollection. Lindsey's believability was crucial to the State's case. He had testified that someone "filled in the blank" for him. He had contradicted himself on the color of the defendant's shirt, changing it from blue and yellow on direct examination, to black and gold (the Latin King colors) on redirect. The defendant, wearing a leather jacket and a Bulls T-shirt, was cuffed to two other men in the back of a squad car when Lindsey made the identification. The defendant at all times denied taking part in the shooting. He said he was elsewhere at the time. So did his alibi witnesses.

Against that evidentiary backdrop, the prosecutor argued:

> "[Lindsey] is taking a lot of chances coming into this courtroom based on where he comes from to tell you all that he saw and what he knows because he wants him held responsible for what happened to Juan Garcia's head."

And in rebuttal:

> "Now, they said you can't believe this guy, this guy James Lindsey, what we put up there you can't believe him. Well, ladies and gentlemen, give me one reason why you can't believe this guy, James Lindsey. By taking that witness stand, he took his life in his own hands. It's a dangerous habit to get up here and testify against a Latin King. Certainly, it's a heck of a lot more dangerous to lie and frame an innocent Latin King. To do that would be to sign his own death warrant. That's why now he's telling the truth."

There was no contemporaneous objection to the argument. Immediately after the jury retired to consider its verdict, the defense lawyer moved for a mistrial because of the "death warrant" argu-

ment. The motion was denied. The argument was specifically referred to in the defendant's motion for a new trial. That motion was denied.

Again, the State contends the failure to object at the time of the argument waives any alleged error. Again, the defendant asks us to apply the plain error doctrine.

First, we look to see whether there was any error. Under any standard, "[p]rosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant." *People v. Landwer* (1995), 166 Ill. 2d 475, 493, 655 N.E.2d 848.

The evidence discloses that Lindsey was not a reluctant witness. There is no indication in the record that he feared retaliation from the Latin Kings or anyone else because of his testimony against the defendant. Certainly, the shooting on the street did not frighten Lindsey:

"Q. At the time of the shooting, were you in fear for your life?
A. No.
Q. Were you at all excited when you heard the shooting?
A. No, something that happens there every day.
Q. So you are used to it?
A. Yes."

We are aware of no separate jurisprudence for cases of gang-related violence. A prosecutor may argue facts and legitimate inferences drawn from the evidence. (*People v. Turner* (1989), 128 Ill. 2d 540, 560, 539 N.E.2d 1196.) It is improper for the prosecutor to argue assumptions or facts not based on the evidence, or to present to the jury what amounts to his own testimony. (*People v. Smith* (1990), 141 Ill. 2d 40, 60, 565 N.E.2d 900.) It is improper for the prosecutor to do or say anything in argument "the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision." *Smith*, 141 Ill. 2d at 60.

There is nothing new about the proposition that "[p]rosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any evidence in the record *** are highly prejudicial and inflammatory." (*People v. Mullen* (1990), 141 Ill. 2d 394, 405, 566 N.E.2d 222; *People v. Hood* (1992), 229 Ill. App. 3d 202, 218, 593 N.E.2d 805; *People v. Ray* (1984), 126 Ill. App. 3d 656, 662, 467 N.E.2d 1078.) In *Mullen* and *Hood* the courts reversed convictions despite the lack of timely objection by the defendant.

An argument resembling the one in this case occurred in *People v. Shlimon* (1992), 232 Ill. App. 3d 449, 456, 597 N.E.2d 728. There, the prosecutor said:

" 'Imagine the courage it took for Patrick Michael and Sargon to get up on that stand, relive the moment, point the finger at that man and identify him as the shooter, knowing he is a gang member.' "

Citing *Mullen*, the court held the unobjected-to remarks were inappropriate and constituted error, but did not rise to the level of plain error because the evidence was not closely balanced.

In *Shlimon*, as here, there was no evidence the witnesses feared gang retaliation.

■ In this case, the prosecutor first told the jury Lindsey was risking his life by testifying against a Latin King. There was no such evidence. Then the prosecutor went further. In effect, he was telling the jury that Lindsey should be believed because "to lie and frame an innocent Latin King *** would be to sign his own death warrant." That is, truth he lives, lies he dies—at the hands of the defendant or the defendant's gang.

The prosecutor was implying he had some heretofore secret knowledge about who lives and who dies at the hands of the Latin Kings. A guilty verdict would save Lindsey's life. A not guilty verdict would end Lindsey's life. The argument played to popular fears about gang violence. It did not have a shred of support in the record.

The State contends it should not be bound by the record when it makes this kind of argument. It says jurors should not be required to forget what they know from simply living in and around Chicago: gangs kill people, often for the most trivial of reasons.

We are not prepared to take that perilous step away from traditional notions of basic fairness in criminal trials. We believe the argument made in this case panders to fear and emotion, instead of reason. The argument was unwarranted. The jury should not have heard it.

### THE IMPACT OF THE ERRORS

■ Our conclusion that errors occurred in the trial court does not resolve the case. We must decide whether defense counsel's failure to preserve the errors in a proper way requires us to affirm the conviction because of procedural default.

We understand the plain error rule is a limited exception to the doctrine of waiver. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577-78, 404 N.E.2d 233.) If the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), "the procedural default must be honored." *People v. Keene*, 169 Ill. 2d at 17.

Some cases indicate the plain error doctrine simply "permits a reviewing court to *consider* an alleged error not properly preserved

for review where the evidence is closely balanced *or* where the error is so fundamental and of such magnitude that the accused was denied a fair trial." (Emphasis added.) (*People v. Edgeston* (1993), 157 Ill. 2d 201, 239-40, 623 N.E.2d 329.) Taken literally, that would mean a court could find there was plain error, consider it, then affirm the conviction because the error probably had no impact on the outcome of the case. See *Mullen*, 141 Ill. 2d at 407. Also see *People v. Nelson* (1995), 275 Ill. App. 3d 877, 883, 656 N.E.2d 1110.

*Keene*, however, states that "plain error exists only with respect to 'fundamental fairness.' " (*Keene*, 169 Ill. 2d at 17.) That means, said the court, "while all plain errors are reversible ones, not all reversible errors are also 'plain' for purposes of Rule 615(a)." *Keene*, 169 Ill. 2d at 17.

■ In this case, we have set out the material facts. The evidence was closely balanced.

The out-of-court identification testimony, although the subject of a sustained objection, caused grave harm because it served as a substitute for courtroom identification. *People v. Johnson* (1990), 202 Ill. App. 3d 417, 426, 559 N.E.2d 1041.

The prosecutor's argument concerning a gang death warrant, not based on any evidence in the record, intended to bolster a witness' identification testimony, was highly prejudicial and inflammatory. (See *Mullen*, 141 Ill. 2d at 405; *Hood*, 229 Ill. App. 3d at 217-18.) In *Mullen*, in addition to an eyewitness to the crime, the State introduced the defendant's confession. The court held the evidence was closely balanced.

There is no need to determine whether the errors we have described, when taken individually, would be sufficient to reverse the defendant's conviction. These errors, when considered together, undermined the fundamental fairness of the trial. These errors, then, are plain and warrant reversal.

We add this cautionary note: responsible advocacy would not require us to engage in a plain error analysis. Errors that are plain on review ought to be plain at trial. Just as prosecutors risk reversal of otherwise sound convictions by making disapproved arguments, defense lawyers risk waiver of errors that, in fairness to the accused, ought to be considered on appeal.

CONCLUSION

Because of the conclusion we have reached, we need consider only one of the other issues raised by the defendant. The defendant contends the evidence was not sufficient to prove him guilty beyond a reasonable doubt. We find the admissible evidence was sufficient to

support a guilty verdict. We reverse the defendant's conviction and remand the cause for a new trial.

Reversed and remanded.

CAMPBELL, P.J., and BRADEN, J., concur.