2026 IL App (1st) 240158-U

No. 1-24-0158

Order filed May 27, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19CR14766 |
| | ) | |
| ANTONIO DONALD, | ) | Honorable |
| | ) | Michele McDowell Pitman, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Evidence was not so closely balanced that the trial court's evidentiary error warranted reversal.

¶ 2    Following a jury trial, defendant Antonio Donald was convicted of aggravated unlawful use of a weapon (AUUW) and sentenced to one year in prison. On appeal, defendant contends that the trial court plainly erred by admitting a police officer's hearsay testimony as to a description,

relayed to the officer by radio, of a man brandishing a firearm. As we find that the evidence was not closely balanced, we affirm.

¶ 3    Defendant was charged with AUUW for allegedly possessing a firearm on a public street or land without a valid Firearm Owner's Identification (FOID) card. 720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2018).

¶ 4    Officer Tracy Lewis testified that, around 9:30 p.m. on October 3, 2019, he received a radio call of shots fired with a possible gunshot victim on 141st Street and Tracy Avenue in Riverdale. Lewis then received a second call of "a man putting a gun in a book bag in an alley" behind a building on Tracy. The State asked Lewis to provide the description of the man that was relayed over the radio. Lewis responded, "a male black with short dreads with a blue jean jacket on." Defense counsel objected to the description as hearsay, and the court sustained the objection.

¶ 5    Lewis testified that he ran toward the alley near the reported address and noticed a man running northbound. Lewis slowed down for safety as two males who "did not fit the description" walked past him. The State then asked Lewis to describe the man running northbound. Defense counsel raised an objection, which the court overruled. Lewis stated that the person running was a "male black with dreads and a blue jean jacket," who had "short dreads at the time."

¶ 6    While in the alley west of Tracy, Lewis observed the man just north of him. Lewis shined his flashlight "towards that person fitting that description," and yelled. The man ran toward 141st. Lewis never lost sight of the man, who had "[a] book bag with a cartoon character on it," and "fit the description wearing a blue jean jacket." Defense counsel objected, stating "there was no description" in evidence. The court overruled counsel's objection.

¶ 7    Lewis testified that the man, whom he identified in court as defendant, ran to a white sedan parked just east of the alley on 141st, and tossed the backpack inside the sedan's rear driver's side door. Lewis drew his service weapon and ordered defendant to raise his hands and drop to the ground. Another officer secured and handcuffed defendant.

¶ 8    Lewis ordered the passenger seated behind the sedan's driver's seat out of the vehicle, patted him down, and passed him to another officer. Lewis found two backpacks in the back seat of the sedan. He retrieved and searched a solid red backpack, and found no contraband. Lewis then retrieved the backpack he saw defendant toss into the vehicle. When Lewis opened the backpack, he felt something hit his foot. Lewis looked down and saw a revolver on the ground.

¶ 9    The incident was filmed on Lewis's body-worn camera. The State published the video, which Lewis narrated for the court. The video is included in the record on appeal, and this court has viewed it. The video is without audio, poorly lit, and with significant frame instability.

¶ 10    As the video begins, Lewis jogs through an alley. He crosses a street, passing police vehicles, officers, and bystanders. He continues through a gangway, and enters another alleyway. Two individuals emerge from behind a dumpster and move off frame as Lewis shines his flashlight further down the alleyway, highlighting vehicles and dumpsters. At trial, Lewis gestured toward an unidentified area on the screen and testified that he faced northbound and saw defendant.

¶ 11    In the video, Lewis runs through the alley and onto the street. He approaches a white sedan parked on the opposite side of the street, with its front and rear driver's side doors open. Lewis draws his service weapon, and defendant appears in frame, wearing a denim jacket, standing next to the rear passenger side of the white sedan, with his hands up. Another officer appears in frame, his service weapon pointed at defendant as defendant drops to the ground.

¶ 12 In the video, the passengers remain seated in the sedan as Lewis moves around. The video is unclear for a few moments. Then Lewis gestures for a passenger in the sedan's back seat to exit the vehicle, and the passenger complies. Lewis searches the passenger while the other officer handcuffs defendant, who remains face-down on the street. Lewis then retrieves and searches a red backpack while another officer detains the passenger near the trunk of the sedan. The video view is then obstructed, but Lewis testified at trial that he retrieved the other backpack from the vehicle. Soon after, the camera pans toward the rear driver's side wheel of the sedan, and Lewis recovers a small firearm from the ground. Lewis testified at trial that the firearm fell from the backpack and hit his foot.

¶ 13 Lewis further testified that he did not approach the two individuals in the alley because "they did not fit the description that was given." The defense objected, claiming that the testimony referenced the hearsay description, and the court overruled the objection.

¶ 14 The State published the prisoner property sheet for defendant, which lists items recovered from defendant when he was taken into custody. The sheet lists one bracelet, one wallet, one cell phone, long johns, one Gateway laptop, and one Nickelodeon backpack. Lewis testified that he documented the listed items as defendant's property and that defendant signed the form.

¶ 15 On cross-examination, Lewis stated another officer accompanied him as he ran through the alleyway and saw the person with the backpack. The same officer was with Lewis at the end of the video. As to the content of the video, Lewis stated that "you never see" the person running with the backpack "on camera." Lewis explained the person ran through the alleyway, tossed the bag into the white sedan, and then immediately stopped because Lewis "yelled out for him to put his hands up." Lewis could not recall if the bag contained defendant's identification, house keys,

mobile phone, or cash. He testified that the dispatch description of the person with the firearm was recorded and could be reviewed.

¶ 16    Illinois State Police Firearm Services Bureau (FSB) supervisor John William Strode testified that he conducted a record search of defendant around December 17, 2019, and discovered no record of a FOID card or Concealed Carry License (CCL) for defendant. Strode conducted a subsequent search in July 2023 and found no FOID record on file. The State then entered into evidence and published to the court a certified abstract from the FSB, which is included in the record on appeal and has been viewed by this court. The certified abstract, dated December 17, 2019, indicates no record of any FOID card or CCL in defendant's name at that time.

¶ 17    Defendant called his sister, Britini Alexander, who testified that she attended a vigil at 141st and Tracy on the night of the incident. She saw defendant at the vigil around 8:30 p.m. and he did not carry a backpack. She chatted with defendant. Then, gunfire occurred and everyone ran.

¶ 18    After the shooting, Alexander returned to 141st and Tracy. Defendant stood near a white sedan, talking to people in the vehicle. Alexander remained at the corner for two to three minutes, watching defendant, before a police officer arrived and pointed his firearm at defendant. Alexander never saw defendant run toward the white sedan, and she never saw him with a backpack. Alexander stated defendant was "standing on the side of the car the whole time."

¶ 19    On cross-examination, Alexander denied seeing defendant in an alley. As she approached a crowd near the intersection, she saw defendant standing near the white sedan. She saw him for the entire time she stood at the intersection.

¶ 20 On redirect, Alexander stated that shots were fired "minutes after" she hugged defendant. She restated that she saw defendant standing near the white vehicle for two to three minutes before she heard the police shout at him with their weapons drawn.

¶ 21 Defendant testified that around 8:20 p.m. on the evening of the incident, he arrived at 141st and Tracy for a friend's vigil. Shots were fired as attendees entered the vigil and prepared to light candles. Defendant ran to a hallway, then exited to 141st and Tracy to check on friends and family. He walked to the white sedan and spoke to his friend in the back seat. Sometime after, defendant "turned around to [Lewis's] gun in [his] face." Defendant raised his hands and dropped to the ground.

¶ 22 Defendant denied arriving with a backpack or tossing one into the sedan. He did not run through an alley, and Lewis did not chase him. Defendant never before saw the recovered firearm, and never owned any firearms. While defendant was detained at the police station, Lewis completed and signed the property sheet listing the Nickelodeon backpack as defendant's property and told defendant to sign the form.

¶ 23 On cross-examination, defendant stated that he signed the document without realizing that it listed the backpack. A few days later, he returned to the Riverdale Police Department to retrieve his phone and wallet, and the backpack was issued to him.

¶ 24 Defendant clarified that officers ran toward him as he stood near the white sedan. Defendant wore a blue jean jacket and blue jeans that night, and his hair was in short "dreads." When the State asked defendant if he wore "that blue jean jacket" when he "actually ran up to that white vehicle," defendant responded, "No."

¶ 25    In closing argument, the State recounted that Lewis "received a call with a description and he went to that description. He tried to find that person from that call. That person in an alley with a book bag and a firearm." The State asserted that defendant fit the description provided in the call, and later added that there was "a call of a person matching this defendant's description with a firearm." The State continued, "[defendant] wants you to believe that he was just standing there, a person matching the description, matching a backpack with a firearm and all of a sudden Officer Lewis finds the person matching the description, and a backpack, and a firearm." The State added that defendant "ha[d] longer dreadlocks" at trial, and that Lewis had testified that defendant's dreadlocks were shorter on the night of the incident.

¶ 26    In closing, defense counsel recounted, *inter alia*, Alexander's testimony that she never saw defendant running, being chased through an alley, or carrying a backpack. Counsel also recounted defendant's testimony that he never had a backpack, and that police approached him as he stood near the sedan. Counsel noted that the video never shows defendant carrying a backpack, and maintained that Lewis did not chase defendant through the alley. Counsel questioned why other officers at the scene did not testify, and why the State relied on Lewis's testimony as to the dispatch's description of defendant rather than playing the dispatch recording in court.

¶ 27    In rebuttal, the State recounted that Lewis received "that call of a person with the gun in a book bag. This person, matches the description. He goes two blocks, around alleys, around buildings, lo and behold there's the defendant, matching the description ***."

¶ 28    In issuing instructions to the jury, the court instructed the jury to disregard questions that were withdrawn "or to which objections were sustained."

¶ 29    The jury found defendant guilty of AUUW. Defendant filed a motion for a new trial but did not raise the present claim of error in the motion. The court denied the motion, and sentenced defendant to one year imprisonment.

¶ 30    On appeal, defendant contends that he was denied a fair trial because the trial court erroneously admitted Lewis's hearsay testimony as to the radio description of "a male black with short dreads with a blue jean jacket" placing a firearm in a backpack. Defendant argues that the detailed description was not necessary to explain Lewis's investigation and served only to corroborate Lewis's subsequent testimony that defendant possessed the backpack and the firearm. Defendant maintains that, although the trial court sustained his initial hearsay objection to Lewis's testimony of the radio call description, the court erred when it allowed (1) Lewis to later reference "the description" in testimony, and (2) the State to rely on "the description" in closing arguments.

¶ 31    Defendant acknowledges that he did not preserve this issue for review because he did not raise it in his motion for new trial. He seeks relief from forfeiture under either first prong plain error or, alternatively, ineffective assistance of trial counsel, for failing to preserve the issue.

¶ 32    The plain error doctrine allows this court to address a forfeited claim where a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error"; or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Logan*, 2024 IL 129054, ¶ 53. The first step of the analysis requires that we determine whether an error occurred. *Id.* Whether there is plain error is a question of law, which we review *de novo*. *People v. Williams*, 2022 IL 126918, ¶ 48.

¶ 33    Hearsay—an out-of-court statement offered to prove the truth of the matter asserted—is generally not admissible absent an exception. *People v. Williams*, 2023 IL App (1st) 192463, ¶ 94. An out-of-court statement is not hearsay, and is admissible, when offered for a purpose other than to establish the truth of the matter asserted. *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 176.

¶ 34    Statements that explain the process of a police investigation are admissible under the rationale that such evidence is not offered for its truth. *Williams*, 2023 IL App (1st) 192463, ¶ 95. However, "an officer may not testify to information beyond what is necessary to explain his or her actions." *Id.* (citing *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 35). "Testimony about the steps of an investigation may not include the *substance* of a conversation with a nontestifying witness." *Williams*, 2023 IL App (1st) 192463, ¶ 125 (citing *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107 (emphasis in original)). Further, it is improper for the prosecution to rely on such statements offered for this limited purpose in arguments to the jury, because doing so exceeds what is necessary to explain investigatory procedures and may be used to establish guilt. *Williams*, 2023 IL App (1st) 192463, ¶ 98.

¶ 35    Here, the issue at trial was whether defendant knowingly carried or possessed a firearm, without a valid FOID card. Defendant conceded at trial that he lacked a FOID card. Lewis testified that he received a radio call alerting him that "a male black with short dreads with a blue jean jacket" had placed "a gun in a book bag in an alley" behind an address on Tracy. These statements go to the essence of the dispute: whether defendant carried a firearm in public on the night of the incident. *Williams*, 2022 IL 126918, ¶ 52.

¶ 36    The court correctly sustained defense counsel's first hearsay objection to Lewis's testimony of the radio description provided and later advised the jury to disregard questions to

which objections were sustained. "Ordinarily, a trial judge's instruction to a jury to disregard something it heard would put an end to the matter." *People v. Rivera*, 277 Ill. App. 3d 811, 817 (1996). Yet, despite a trial judge's jury instruction to disregard it, improper hearsay testimony is "reclaimed" where it is repeated, referred to, and relied upon at trial and in closing argument. *Id*. at 820; see also *Williams*, 2023 IL App (1st) 192463, ¶ 98. "[I]t is practically impossible for the average juror to divest his mind of such testimony." *People v. Burns*, 171 Ill. App. 3d 178, 185 (1988) (citing *People v. Hernandez*, 121 Ill. 2d 293 (1988)).

¶ 37    The record shows that after the court sustained defendant's hearsay objection to testimony describing "a male black with short dreads with a blue jean jacket" possessing a firearm, Lewis testified as to how defendant "fit the description," while the two men walking in the alley "did not fit the description." He added that he pursued a man "fitting that description" and that man "fit the description wearing a blue jean jacket." The State further referred to "the description" at least five times in its closing argument. These repeated references to the inadmissible hearsay description minimized the trial judge's subsequent direction to the jury and effectively reclaimed the initial improper hearsay testimony. *Williams*, 2023 IL App (1st) 192463, ¶ 98 (collecting cases on repetition of improper hearsay); *Rivera*, 277 Ill. App. 3d at 818, 820 (where a witness initially testified that citizens identified defendant as an offender by saying, "that's them," subsequent references to the "conversation" was improper hearsay).

¶ 38    We reject the State's assertion that the court cured any exposure to improper testimony. Both Lewis's testimony at trial and the State's repeated references in closing argument to the "description" and to how defendant "fit the description" made it practically impossible for the jurors to disregard the improper hearsay. *Burns*, 171 Ill. App. 3d at 185. Despite the court's

instruction to the jury, "substantial prejudice does not vanish from the human mind simply because a judge says it should." *Rivera*, 277 Ill. App. 3d at 819.

¶ 39    Moreover, these repeated references during trial and arguments to hearsay testimony identifying defendant as the offender exceeded a proper explanation of investigative steps undertaken. *Williams*, 2023 IL App (1st) 192463, ¶¶ 106-09 (collecting cases); *People v. Jura*, 352 Ill. App. 3d 1080, 1088 (2004) (collecting cases); *Rivera*, 277 Ill. App. 3d at 820 ("Hearsay testimony identifying the defendant as the one who committed the crime cannot be explained away as 'police procedure,' even where the evidence is limited to a non-hearsay purpose.").

¶ 40    Having found error, we turn to whether defendant's conviction may have resulted from the error, not the evidence. *Williams*, 2022 IL 126918, ¶ 55. Under the first plain error prong, a forfeited error is reviewable "where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Logan*, 2024 IL 129054, ¶ 71.

¶ 41    To determine whether the evidence at trial was closely balanced, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* This inquiry requires that we assess the evidence on the elements of the charged offense, "along with any evidence regarding the credibility of the witnesses." *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 47. "Evidence has been found to be closely balanced where each side has presented credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account." *Id.* ¶ 48 (citing *People v. Naylor*, 229 Ill. 2d 585, 608 (2008)). Stated differently, "[e]vidence may be closely balanced when a case turns on a credibility determination between conflicting testimony." *People v. Scott*, 2020 IL App (1st)

180200, ¶ 51. But where one party's version of events is corroborated, implausible, or unrefuted, no "credibility contest" exists. *Id.*

¶ 42    The evidence at trial showed that Lewis responded to a call describing an individual placing a firearm in a backpack in an alleyway behind Tracy. He testified that he saw defendant, who matched the description and carried a backpack with a cartoon character on it, running through an alleyway near the reported location. Lewis pursued defendant, who ran toward a white sedan and tossed the backpack inside the vehicle. Lewis approached and detained defendant next to the vehicle. When he retrieved the backpack from the sedan and searched it, something bounced off his foot, and he recovered a firearm on the ground. The video obtained from Lewis's body-worn camera shows Lewis running through streets and alleyways, shining his flashlight down an alleyway and running in that direction, approaching defendant while defendant stood near the sedan, searching two backpacks, and retrieving a firearm from the ground near the sedan. The video never shows the person with the backpack.

¶ 43    Alexander testified that she did not see defendant with a backpack prior to the shooting, nor did she see him running toward the sedan, with or without a backpack. Rather, she saw defendant standing near the white vehicle before police approached him. Defendant testified that he never ran down an alleyway, nor to the white sedan. Rather, he stood next to the vehicle talking to a friend in the back seat. Defendant conceded he lacked a FOID card, and maintained that he never carried a backpack, did not toss one into the backseat of the sedan, and never possessed a firearm.

¶ 44    Upon careful, qualitative, and commonsense consideration of the totality of the evidence presented at trial, we conclude that the evidence was not closely balanced. See *Jackson*, 2019 IL

App (1st) 161745, ¶ 47. At the outset we note that testimony did not conflict over whether the backpack held the firearm—only whether, or when, defendant carried the backpack while in public. We further note that the testimonies of Alexander and Lewis do not conflict. That is, Alexander's testimony that she did not see defendant with a backpack *before* the shooting fails to refute Lewis's testimony that he saw defendant carrying a backpack through an alleyway *after* the shooting. Similarly, Alexander's testimony that she saw defendant standing near the sedan before officers detained him fails to refute Lewis's testimony that he saw defendant toss the backpack into the sedan before defendant was detained. A commonsense assessment of the evidence suggests that both observations are compatible: namely, that defendant ran to the vehicle as Lewis chased him, threw the bag into the vehicle, stood next to it, and Alexander saw defendant standing there while Lewis sought to catch up to him. Accordingly, we cannot say that Alexander's testimony refutes Lewis's account of events. *Id.*; *Scott*, 2020 IL App (1st) 180200, ¶ 51 (stating there is no "credibility contest" where evidence is unrefuted).

¶ 45 We also find that no "credibility contest" exists between defendant's testimony and that of Lewis because the footage retrieved from Lewis's body-worn camera corroborates his testimony as to his pursuit of defendant through the alleyway, across streets, and to the sedan that evening. *Scott*, 2020 IL App (1st) 180200, ¶ 51 (stating there is no credibility contest where evidence is corroborated). The video also shows defendant standing next to the white sedan as Lewis approaches and detains him, corroborating both Lewis's and Alexander's testimony that defendant stood next to the vehicle before police detained him.

¶ 46 Moreover, the prisoner property sheet, which defendant signed in agreement, identified the Nickelodeon backpack as defendant's property, corroborating Lewis's statement that defendant

possessed the backpack. Defendant admitted to later retrieving the backpack from the police station when he recovered his other possessions. We are not persuaded by defendant's assertion that the backpack was not his and that he was unaware that it was included on the prisoner property sheet, when he was provided an opportunity to review and sign the form. Common sense suggests that defendant would not return to the police station to reclaim a backpack that was not his own, especially when it held a firearm that was allegedly not his own.

¶ 47    Accordingly, because Lewis's testimony was unrefuted and corroborated, we do not find that the evidence at trial was closely balanced. Thus, we cannot say that defendant's guilty verdict may have resulted from the erroneous hearsay testimony. That is, the error was "not prejudicial in the context of first-prong plain error." *Williams*, 2022 IL 126918, ¶ 65.

¶ 48    Because we have found no prejudicial error, we need not address defendant's alternative claim for ineffective assistance of counsel. *People v. White*, 2011 IL 109689, ¶ 134 (declining to engage in an ineffective assistance analysis where defendant cannot show prejudice under plain error).

¶ 49    For the reasons discussed, we affirm.

¶ 50    Affirmed.