2025 IL App (1st) 231005-U

FIRST DISTRICT,
SIXTH DIVISION
January 17, 2025

No. 1-23-1005

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 CR 932901 |
| | ) | |
| EDWARD WILLIAMS, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant, | ) | Judge Presiding. |

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1      *Held*:   The trial court did not err by denying defendant's motions for mistrial, trial counsel was not ineffective for failing to raise an as-applied constitutional challenge to defendant's sentence, and the trial court did not misapprehend the applicable sentencing range.

¶ 2      Following a shooting on August 31, 2018, 23-year-old[1] defendant Edward Williams was charged with the first degree murder of Jasmine Jackson and attempt first degree murder of Tyre Hardnick. After separate but simultaneous jury trials with codefendant Kevin Gayden, the jury

_____

[1] In his opening brief, Williams repeatedly asserts that he was "12 days past his 22nd birthday" at the time of the shooting. The record reflects that Williams was 23 years old at the time of the shooting.

found Williams guilty of both offenses and he personally discharged a firearm that proximately caused the death of Jackson and personally discharged a firearm during the attempt first degree murder. The circuit court sentenced Williams to a total of 78 years' imprisonment. On appeal, Williams contends: (1) the trial court erred in denying his motions for mistrial after an investigating detective improperly identified Williams in a surveillance photograph and after the State's comments in rebuttal closing argument; (2) trial counsel provided ineffective assistance during his sentencing hearing; and (3) the trial court misapprehended the applicable statutory sentencing range. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       Around 8:45 a.m. on August 31, 2018, Jackson and Hardnick were walking near 4412 W. West End Avenue in Chicago when two men emerged from an alleyway and gunshots rang out. Jackson was fatally shot in the head. Hardnick was hit in the left elbow. The two men left the area in a rented white Nissan Versa registered to Williams. At approximately 5:00 p.m. that night, police officers stopped the white Nissan near 346 South Keeler. They arrested the driver Williams and his two passengers, including Brian Hall. Hall and Hardnick identified Williams in still photographs from surveillance video as being one of the men present at the time of the shooting. Williams was then charged with first degree murder (720 ILCS 5/9-1(a)(1)) and attempt first degree murder (720 ILCS 5/8-4(a); 720 ILCS 5/9-1(a)(1)).

¶ 5                                     A. Pre-Trial

¶ 6       Prior to trial, Williams filed a motion *in limine* to prevent Hall from identifying him in the surveillance video at trial. Williams argued this lay identification testimony should be barred pursuant to *People v. Thompson*, 2016 IL 118667, because "the jury is just as capable as Hall in determining whether the person depicted in the surveillance footage is Mr. Williams." The State argued Hall was uniquely familiar with Williams because he had lived with him for eight years

and "considers him to be family." The trial court reviewed the factors enumerated in *Thompson* and ruled Hall would be allowed to identify Williams in the video.

¶ 7                                      B. Jury Trial

¶ 8        The record shows Hardnick left his house at 217 North Kostner to walk Jackson home around 8:30 a.m. on August 31, 2018. Hardnick and Jackson were walking on the north side of W. West End Avenue and approached an alley that ran between Kostner and Kenneth. When they got to the mouth of the alley, two Black men "emerged from the alley and opened fire." One of the men was wearing a grey sweatshirt and the other was wearing red pants. Hardnick saw the man in grey extending his arm towards him, holding what he was "[p]retty sure *** was a gun," and Hardnick took off running. Jackson did not follow Hardnick. Hardnick heard at least ten gunshots and noticed he had been shot in the left elbow. He went into a building nearby and someone gave him a wrap for his arm. Jackson died from a gunshot wound to her head and the manner of death was homicide.

¶ 9        Hardnick went home and attended his cousin's funeral later that day. Afterward, he went to the hospital for treatment. At the hospital, Hardnick told police two Black men shot at him. He did not identify either man. Hardnick explained he did not go to the police right away because he was "[s]cared" of being viewed as a "snitch." He said, "[W]here I'm from, people don't do things like that, it's looked down upon."

¶ 10       On September 2, 2018, Hardnick met with Chicago Police Detective Rory O'Brien, who was assigned to act as a "blind administrator" of the photo arrays shown to Hardnick. Hardnick identified Brian Hall and Williams in separate photo arrays as the men he saw emerge from the alleyway before the shooting. Hardnick said he knew Hall and Williams from the neighborhood. Hardnick also identified Williams in a still photo taken from surveillance video by his nickname B.B. and identified the white Nissan driven by Williams in another photo. Hardnick did not know

the individual depicted in a third photograph but recognized the red pants he was wearing from the alleyway. O'Brien testified that when Hardnick viewed the first array, Hardnick said, "I don't recognize anybody. I've seen him in the neighborhood." Hardnick then identified Williams in the second photo array and stated, "I saw him there. I saw him turn and heard shots."

¶ 11    Consistent with his grand jury testimony, Hardnick testified at trial that Williams was the man in the grey hooded sweatshirt from the alleyway. However, Hardnick maintained, "I didn't see who shot me." Hardnick stated he did not see Williams' face when he saw him in the alleyway because he "was running for [his] life." Hardnick acknowledged that when he met with Assistant State's Attorney (ASA) John Henning on September 2, 2018, he told Henning that when he saw Williams in the alley, he could see his face "[c]lear enough."

¶ 12    Helen Davis Sumblen was picking up trash in her yard next door to 4412 W. West End Avenue around 8:45 a.m. on August 31, 2018. Sumblen saw a man and woman "walking back and forth" on W. West End Avenue and approach an alley between her building and the next. Sumblen heard gunshots and saw the woman fall to the ground. She noticed the gunshots came from a man in the alley wearing a grey sweatshirt but did not see his face.

¶ 13    Surveillance video from a nearby apartment complex at 4434 W. West End Avenue was admitted into evidence. Video shows Hardnick and Jackson walking together on the sidewalk. At one point, Jackson falls to the ground and Hardnick jumps over her and runs away across the street. An individual in a grey sweatshirt with the hood up runs past the area where Jackson fell and around the corner through a lawn and parking lot. Additional surveillance videos show the man in the grey sweatshirt and a man in red pants running through a parking lot before getting into a parked white Nissan. The man in the grey sweatshirt enters the driver's seat, the man in the red pants gets into the rear seat, and the car drives away. Numerous other surveillance videos were admitted into evidence showing the man in grey and the man in red pants walking on sidewalks

and the white Nissan driving and stopping on streets in the area approximately ten minutes before the shooting.

¶ 14    Twelve fired cartridge casings were recovered from the alley at the scene of the shooting. Forensic scientist Marc Pomerance determined all twelve cartridge casings were nine-millimeter and fired by the same firearm. No firearm was recovered.

¶ 15    Chicago Police Officer Joseph Lisciandrello stopped the white Nissan near 346 South Keeler Avenue on August 31, 2018, around 5:00 p.m. Williams was driving the car, Hall was in the back seat, and there was a woman in the front passenger seat. All three occupants were arrested.

¶ 16    On September 1, 2018, Chicago Police Officer Paul Presnell processed the impounded white Nissan. Presnell recovered Williams' driver's license, ID card, and debit card from the driver's side door handle. A Geico Insurance claim form in Williams' name was also recovered from inside the vehicle. Jessica Penton of Enterprise Rent-a-Car testified that the white Nissan Versa was rented to Williams on August 17, 2018, through Geico Insurance. From the trunk, Presnell recovered three pairs of jeans, three pairs of shorts, underwear, a pair of "black and white Nike shoes" without shoelaces, and a manila envelope with photographs and other ID cards.

¶ 17    Brian Hall testified he had known Williams for about eight years and lived with him. Hall referred to Williams as his homie and brother and considered him to be family. Hall was arrested with Williams when police stopped the white Nissan the evening of August 31, 2018. Hall acknowledged he had a conversation with police officers at the station and testified before the grand jury, but testified he did not recall many of the questions they asked or answers he gave. Hall did acknowledge identifying Williams as B.B. in a mugshot photograph before the grand jury. He denied identifying Williams and the white Nissan in a photo still from the surveillance video. Hall claimed when he was shown the first and second picture of Williams, one of the officers referred to Williams as B.B. or Edward Williams before Hall identified him. When Hall was asked

if he knew the second person in the photo, Hall said no.

¶ 18		Former ASA Jamie Santini questioned Hall before the grand jury on September 20, 2018. According to Santini, Hall testified at the grand jury that Williams drove a white, four door sedan, and identified the car in a photo still from the surveillance video. Hall also identified Williams in a photo still from the surveillance video as B.B. Hall signed each of the photographs. On cross-examination, Santini acknowledged that Hall testified before the grand jury that "They showed me the first picture and said this is B.B.[,] showed me another picture where they said this is B.B. and another guy asked me to if I know the other guy and I said no."

¶ 19		Chicago Police Detective Ruben Weber and his partner, Detective Graf, met with Hall around 6:36 p.m. the evening of September 1, 2018. Video clips from the interview room were admitted into evidence. In the first clip, Hall is sitting on a bench holding a photo still from the surveillance video. The clip begins during an unintelligible conversation between Hall and Graf and concludes with Graf asking, "but that's B.B.?" Hall's answer is not depicted.

¶ 20		In the second clip, from approximately 7:42 p.m., Hall is lying on the ground as Weber enters the room with Williams' mugshot photograph in his hand. Weber asks Hall, "When you talk about B.B., you know his real name?" Hall responds, "Yeah," and Weber asks, "What's his real name?" Hall answers, "Edward Williams." Weber repeats, "Edward Williams" and shows Hall the photo, asking, "That who you're talking about? That's B.B.?" Hall's reply is inaudible, and the video concludes with Weber saying, "Okay."

¶ 21		As part of his investigation, Weber reviewed video footage from the surveillance camera at 4434 W. West End Avenue and identified numerous photo stills from the video at trial. In one photograph, Weber identified "[t]he offenders from the homicide." The State showed Weber a photo still of the individual in a grey hoodie and asked, "And is that – that was subsequently identified as Edward Williams?" The trial court sustained defense counsel's objection to "leading"

as Weber answered, "Yes, it was." Defense counsel did not object on *Thompson* identification grounds. Weber identified "[t]he car that was used" in another still photo from the video. In another photo, Weber identified, "[t]he two defendants and the car." In the next photo, Weber identified, "[o]ne of the defendants running back to the car." The trial court overruled defense counsel's objection based on "improper testimony." The State asked, "Person running back to the car?" and Weber said, "Yes." For the next three photos, Weber stated, "Same thing." Weber identified another photo as a "[c]lose-up of defendant running back to the car." The trial court sustained the objection of codefendant Gayden's counsel stating, "I will sustain it with regard to the characterization."

¶ 22                          *1. First Motion for Mistrial*

¶ 23        Prior to cross-examining Weber, defense counsel moved for a mistrial, arguing "the detective was identifying the defendants on the video," which was "a violation of *Thompson*." Counsel argued, "there needs to be some curative instruction or there needs to be some remedy here" and asked "for a mistrial if there's not a curative instruction." In response, the State argued Weber "didn't identify any particular person. He was using a title." The trial court denied defense counsel's motion for mistrial, noting, "there's been several people identifying these photographs several different times, whether the detective should have done that or not, I don't disagree with you." The trial court stated, "[I]t's a question of whether or not we tell them not to pay any attention to the pink elephant in the corner here. By addressing it *** I may be highlighting it." The court offered to "address it" and asked counsel, "How do you want to handle this?" Defense counsel requested an opportunity to do research and revisit the issue after cross-examination.

¶ 24        After a break following Williams' counsel's cross-examination of Weber, Williams' counsel moved to strike Weber's testimony "in its entirety" because "[t]here has to be some sort of sanction." The trial court found it would be "an extreme remedy" to strike all of Weber's

testimony. Instead, the court offered to admonish the jury and said, "if you're asking that any reference the detective made with regard to his identification of the individuals in the photographs should be stricken, again, if that is what you are asking." The court told counsel, "That's your call. I will do whatever you guys want." Williams' defense counsel requested more time to consider the options. The next day, after considering options overnight, Williams' counsel declined the court's offer to admonish the jury or strike the identification testimony "based on trial strategy not to highlight that issue and ask for any sort of limiting instruction."

¶ 25                                  *2. Second Motion for Mistrial*

¶ 26        While the jury was deliberating following closing arguments, defense counsel moved for mistrial based on the State's comments during rebuttal closing argument speculating that Hardnick and Hall recanted at trial because they were afraid of being seen as "snitches." Counsel argued the State's comments "lead[] to the jury feeling *** that they're not safe [and] *** that the gallery is going to do something and so that is why somebody testified the way they did." The trial court denied defense counsel's motion for mistrial, stating:

> "There was testimony from Mr. Hardnick that one of [the] reasons that he did not come forward immediately was because of the code of the neighborhood that you don't snitch in the neighborhood, I believe there was some arguments made by the defense with regard to what he said and why he said it and why he might have recanted what was originally said. Frankly I think it could have been worded differently. I don't think it gives rise to a mistrial. I did sustain the objections. There was no mention with regard to any type of threats made by anyone in the audience or anybody from the audience."

¶ 27        The jury found Williams guilty of first degree murder and attempt first degree murder, and that he personally discharged a firearm that proximately caused the death of Jackson and personally discharged a firearm during the attempt first degree murder. The trial court denied Williams'

motion for new trial in which he argued, *inter alia*, the circuit court erred in denying his motions for mistrial after Weber's testimony and closing argument.

¶ 28                                  C. Sentencing

¶ 29        At Williams' sentencing hearing, the parties agreed the statutory minimum sentence for first degree murder by personal discharge of a firearm proximately causing death was 45 years' imprisonment and 26 years' imprisonment for attempt first degree murder by personal discharge of a firearm, for a minimum aggregate sentence of 71 years' imprisonment.

¶ 30        Williams' presentence investigation (PSI) report detailed a juvenile adjudication for armed robbery in 2010, and felony convictions in 2012 for armed robbery and 2015 for possession of a controlled substance.

¶ 31        In aggravation, the State pointed out, "[T]his defendant did come from a stable family home. He had a good relationship with his mother as well as his siblings. That he did -- that all his needs were met. However, this defendant did choose to hang out with people that did have a negative influence on him." The State argued Williams "indiscriminately ran out of that alley and started shooting" and continued to shoot at Hardnick as he ran away. The State informed the court Williams was 23 at the time of the shooting. The State also presented victim impact statements from Jackson's sisters.

¶ 32        Williams' sister testified in mitigation. At the conclusion, defense counsel argued, "Mr. Williams is 27 years old. The minimum sentence on this would be 71, which is essentially a life sentence for him. I'd ask that you impose the minimum sentence."

¶ 33        After considering the statutory factors in aggravation and mitigation, the circuit court sentenced Williams to 23 years' imprisonment for first degree murder, 10 years for attempt murder, and an added 25 years and 20 years for the mandatory firearm enhancements on each count, respectively, for a total of 78 years' imprisonment.

¶ 34                                II. ANALYSIS

¶ 35        On appeal, Williams argues: (1) the trial court erred in denying his motions for mistrial after Weber improperly identified Williams in a surveillance photograph and after the State's comments in rebuttal closing argument; (2) his trial counsel provided ineffective assistance during the sentencing hearing; and (3) the trial court misapprehended the applicable statutory sentencing range.

¶ 36                                A. Mistrials

¶ 37        Williams first argues the trial court abused its discretion in denying two of his motions for mistrial and these errors were not harmless beyond a reasonable doubt. The State maintains the trial court properly declined both motions and Williams "suffered no prejudice from either claim of error." We agree.

¶ 38        The propriety of declaring a mistrial is within the broad discretion of the trial court. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). The court should grant a motion for mistrial only if "an error of such gravity" occurred during the proceedings that it "infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). In other words, a defendant must establish "the jury was so influenced and prejudiced that it would not, or could not, be fair and impartial, and the damaging effect of the evidence could not be remedied by admonitions or instructions." *People v. Wills*, 153 Ill. App. 3d 328, 339-40 (1987). "Our standard of review for motions for mistrial is whether the trial court abused its discretion; a court's decision will not be disturbed unless defendant was prejudiced by the testimony." *People v. McDonald*, 322 Ill. App. 3d 244, 250 (2001). An abuse of discretion exists where "the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 39                                   1. *Testimony of Detective Weber*

¶ 40          Williams claims the trial court should have granted his motion for mistrial after Weber "took it upon himself to tell the jury what the video showed: Williams and his co-defendant Gayden." We find Williams' claim is procedurally barred by the doctrine of invited error.

¶ 41          Under the doctrine of invited error, a party is prevented from " 'complaining of error which that party induced the court to make or to which that party consented.' " *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 26 (quoting *In re Detention Swope*, 213 Ill. 2d 210, 217 (2004)). Here, the trial court addressed Williams' objections to Weber's testimony and offered to "admonish the jury *** that any reference the detective made with regard to his identification of the individuals in the photographs should be stricken." Williams' attorney rejected the trial court's offer of a curative instruction or to strike the identification testimony "based on trial strategy not to highlight that issue and ask for any sort of limiting instruction."

¶ 42          Illinois courts have long recognized the effect of a curative instruction. The prompt sustaining of an objection combined with a limiting instruction to the jury is often sufficient to cure an evidentiary error. See *People v. Risper*, 2015 IL App (1st) 130993, ¶ 46. In *Thompson*, our supreme court suggested trial courts provide an instruction to the jury "that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed," in order to "lessen any concerns regarding invading the province of the jury or usurping its function." *Thompson*, 2016 IL 118667, ¶ 59. "The jury is presumed to follow the instructions given to it by the court." *People v. Fields*, 135 Ill. 2d 18, 53 (1990).

¶ 43          Here, Williams' defense counsel initially requested "some curative instruction" or "a mistrial if there's not a curative instruction." The court denied counsel's motion for mistrial but offered to "address it" and asked, "How do you want to handle this?" The court granted defense

counsel's request for "an opportunity to do a little research." Later, defense counsel renewed the motion for a mistrial or, alternatively, to "strike the detective's testimony in its entirety." The trial court denied both requests but offered to admonish the jury and strike "any reference the detective made with regard to his identification of the individuals in the photograph." The court left the decision up to defense counsel, stating, "That's your call. I will do whatever you guys want." Defense counsel again requested more time to "look into the issue." The next day, defense counsel declined the court's offer "based on trial strategy to not highlight that issue and ask for any sort of limiting instruction."

¶ 44    The decision to decline a limiting instruction is a valid trial strategy to avoid "drawing undue attention" to the objected-to evidence. *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52. A party cannot reject a curative instruction and then rely on the absence of that instruction to claim error. See, *e.g.*, *People v. Green*, 2022 IL App (1st) 181664-U, ¶ 59 (citing *People v. Montes*, 2020 IL App (2d) 180565, ¶ 45) (defendant invited the error where he rejected a curative instruction to disregard the contested testimony). In this case, defense counsel repeatedly rejected the court's offers to admonish the jury and strike Weber's testimony "with regard to his identification of the individuals in the photograph."

¶ 45    We disagree with Williams that he "had only two options: 1) try to challenge the basis for Weber's identification, knowing that doing so created a risk of prejudicing Williams further; or 2) let the identification stand." The record reflects the court recognized that Weber "testified to a lot of different things with regard to the investigation besides the photographs" and identified Williams two to four times, at most. The court gave counsel the options to admonish the jury and strike Weber's identification testimony. After two lengthy opportunities to research and consider possible recourse, defense counsel made the explicit strategic decision to decline both options.

¶ 46    While Williams claims that granting a mistrial was "the only way" to cure the prejudice

from Weber's testimony, the court's proposed actions would have alleviated the concern of Weber's testimony "invading the province of the jury or usurping its function." *Thompson*, 2016 IL 118667, ¶ 59. We agree with the State that Williams cannot now claim error in denying a mistrial where he refused this instruction and the court's offer to strike the testimony at issue. This is particularly so given the other evidence presented at trial that casts no doubt on the fact Williams was the person in the grey sweatshirt emerging from the alley.

¶ 47        Prior to Weber's testimony, both Hardnick and Hall identified Williams in photo stills from the surveillance video that were nearly identical to the photo shown to Weber. Hardnick repeatedly identified Williams as the man in the grey sweatshirt to ASAs, before the grand jury, and at trial. Hardnick testified that he saw Williams extending his arm holding a gun and Sumblen testified that the man in the grey sweatshirt was the shooter. Before Weber's testimony at trial, the jury watched several surveillance videos showing the two men walking around the area approximately ten minutes before the shooting and running to the car after the shooting. Further, other evidence at trial established the white Nissan was a rental in Williams' name, he was stopped while driving the car later the same day of the shooting, Williams' driver's license, ID card, and debit cards were found in the driver's side door handle, and the shoes worn by the man in the grey sweatshirt in the surveillance video were found in the trunk of the car.

¶ 48        Given the opportunity to cure any prejudice with a limiting instruction or by striking the identification testimony, Williams' counsel made the strategic decision to decline the court's offer. Mistrial was not "the only option" and, under these circumstances, where the other evidence was so overwhelming, we cannot say the court abused its discretion in declining to declare a mistrial based on Weber's testimony.

¶ 49                                    2. *Closing Argument*

¶ 50        Williams also argues the court erred in denying his motion for a mistrial following the

State's rebuttal closing argument where the prosecutor's comments suggested Hardnick and Hall were victims of witness intimidation. We disagree.

¶ 51    A prosecutor has wide latitude regarding the content of closing and rebuttal arguments and may comment on evidence and any fair and reasonable inferences the evidence may yield. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). "[A] reviewing court applies an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument." *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64. Reviewing courts are to consider the whole closing argument, rather than focusing on selected phrases or remarks, and will find reversible error "only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Runge*, 234 Ill. 2d at 142. The complained-of comments in this case fall short of this standard.

¶ 52    Williams complains of the following statements of the prosecutor:

"[Hall] signed [the photograph of the shooter] in the grand jury. He said it about the single photo in the lockup, and he said those things before he had to come face-to-face with the people he knows, the defendant, before he had to come face to face the other guy he knows, Kevin Gayden, before he had to sit in an open courtroom and bear witness in front of all of these people, all of the people from the neighborhood on both sides, on Jasmine's side, before he had to come and bear witness before all the people on the defendant's side. He was in front of the grand jury where he was safe, where he was secure."

Later, the State argued:

"Ladies and gentleman, did you notice how the courtroom filled up when Tyre Hardnick took the stand? Did you notice how all of a sudden there were a lot more people *** What did Tyre say from the witness stand, couldn't quite bring himself to say—confronting the defendant, he couldn't quite bring himself to say in front of all these people *** [b]ut he

basically did say, he said, the man in the gray hoodie is Edward Williams. He definitively said that from the stand."

The State continued shortly thereafter:

"Let's talk about the other things Tyre Hardnick had said before, before he was face-to-face with Edward Williams, he was face-to-face with Kevin Gayden in court, before he had to stare at all these people in the courtroom. *** Before he had to worry about who might be watching to see if he snitches."

Finally, the State argued:

"You can consider Tyre's statements to ASA John Henning, his statements before the grand jury the same as if he said them from that witness stand and you should be saying them in the comfort, not having to be face-to-face, not having to stare at the defendants, not having to worry about who was watching."

¶ 53    Notably, before the State's rebuttal closing argument, defense counsel argued in closing:

"He said I'm not a snitch. We don't do that in my neighborhood. That's very telling. It's probably the truest thing that man has ever said. He is not a snitch because Edward Williams didn't do it. How can you be sitting on the witness stand in a murder trial testifying and confidently say I'm not a snitch, we don't do that in my neighborhood. The only way he can say that, the only way he can say he is not a snitch is if Edward Williams didn't do it. The person that did do it he is not snitching on."

The prosecutor's arguments concerning Hardnick's professed fear were in direct response to defense counsel's argument and based on the evidence and reasonable inferences therefrom. See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) ("Statements will not be held improper if they were provoked or invited by the defense counsel's argument.").

¶ 54    We reject Williams' argument that the prosecutor's statements explicitly suggested

Hardnick changed his story on the witness stand based on threats or intimidation from Williams or members of the gallery. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 89. Instead, they were based on Hardnick's testimony he did not go to the police immediately after the shooting because of his fear of being labeled a "snitch." According to Hardnick, "[P]eople don't do things like that, it's looked down upon" in the neighborhood, of which Hardnick and Hall were both members.

¶ 55        Further, the State's argument attempted to explain why Hall and Hardnick recanted or were unable to remember while testifying at trial. Consistent with this argument, the State, drawing reasonable inferences from the evidence, posited hypothetical reasons why their recollections changed. In suggesting Hardnick and Hall did not want to be considered a "snitch," the State made no mention of Williams or any threats or intimidation by anyone. When the State suggested Hall or Hardnick possibly did not want to be in court, it did not offer any reason or explanation why. And when the State inferred Hardnick and Hall might have been scared, it never stated who or what they could have been afraid of. See *Green*, 2017 IL App (1st) 152513, ¶ 89.

¶ 56        In support of his argument that it was "improper for the State to argue, without any basis, that the people in the gallery came to intimidate Hardnick or that he was in fact intimidated by them," Williams relies on our supreme court's decision in *People v. Mullen*, 141 Ill. 2d 394 (1990). *Mullen* is distinguishable. In *Mullen*, the State suggested during closing argument "that witnesses were reluctant to testify because they were afraid that the defendant would shoot them in the back if they did so." *Id.* at 405. Because there was no evidence that the defendant threatened or intimidated any witness, the court found that " '[p]rosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any evidence in the record * * * are highly prejudicial and inflammatory.' " *Id.* (quoting *People v. Ray*, 126 Ill. App. 3d 656, 662 (1984)).

¶ 57    Unlike in *Mullen*, the State never insinuated Williams or anyone else had threatened Hall or Hardnick into changing their statements. Instead, the State recounted how Hall and Hardnick initially cooperated with the police but changed their stories at trial. We cannot say the State's comments were improper, particularly when made in direct response to defense counsel's closing argument of "snitch."

¶ 58    Williams' reliance on *People v. Rivera*, 277 Ill. App. 3d 811 (1996), is misplaced. In *Rivera*, the State argued in closing that by testifying, a witness "took his life in his own hands" and that lying and framing an innocent Latin King "would be to sign his own death warrant." *Id.* at 820. However, there was no indication in the record the witness was reluctant or feared retaliation. *Id.* at 821. The reviewing court found the State was implying that it had some "secret knowledge about who lives and who dies at the hands of the Latin Kings": a guilty verdict would save the witness's life, and a not-guilty verdict would end it. *Id.* at 822. Because the evidence was closely balanced, the cumulation of this and other errors warranted reversal. *Id.* at 823.

¶ 59    Unlike in *Rivera*, Hardnick and Hall were reluctant to repeat their prior statements to investigators and in front of the grand jury. The State's attempt to explain these discrepancies did not attribute any reluctance to their fear of Williams or anyone else specifically. Instead, it focused on the pressure of testifying in a public trial. After considering closing arguments and the record as a whole, we find the trial court did not abuse its discretion in refusing to grant Williams' motion for mistrial based upon the State's closing argument.

¶ 60                                    B. Sentencing

¶ 61    Next, Williams argues his counsel was ineffective for failing to raise an as-applied proportionate penalties challenge to Williams' sentence. He also contends the trial court misapprehended the applicable statutory sentencing range. We disagree.

¶ 62                            1. *Ineffective Assistance of Counsel*

¶ 63        Both the United States and the Illinois constitution guarantee criminal defendants the right to effective representation of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15 (citing U.S. Const. amends, VI, XIV, and Ill. Const. 1970, art. I, § 8); see also *People v. Domagala*, 2012 IL 113688, ¶ 11. Claims of ineffective assistance of counsel are governed by the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under this test, to prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that: (1) counsel's representation was deficient; and (2) counsel's deficient performance prejudiced the defendant. That is, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have been different. *Domagala*, 2012 IL 113688, ¶ 11 (citing *Strickland* 466 U.S. at 687-88, 694).

¶ 64        A reasonable probability is one sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. Generally, to establish prejudice in sentencing, the defendant must show a reasonable probability the circuit court would have imposed a lesser sentence if his counsel had not erred. See *People v. Steidl*, 177 Ill. 2d 239, 257 (1997). "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697).

¶ 65        We find Williams has failed to meet his burden of showing a "reasonable probability" under the prejudice prong of *Strickland* and, accordingly, we proceed directly to this consideration. See *People v. Johnson*, 2021 IL 126291, ¶ 53 ("[I]f it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient.").

¶ 66        At the sentencing hearing, it was established Williams was 23 years old at the time of the

shooting and had a background that consisted of a juvenile adjudication for armed robbery in 2010, and felony convictions in 2012 for armed robbery and in 2015 for possession of a controlled substance. Williams' PSI reflected he had a "normal childhood" and "all his needs were met." He received "mostly A's and B's" in school while receiving "special education for all classes except math." He previously worked as a cook at a Cheesecake Factory and aboard a Chicago cruise ship, and he had a four-year-old daughter.

¶ 67     In imposing sentence, the court stated it had considered "the effect of the sentence upon defendant and obviously his dependents *** the facts of the case, and *** defendant's background and likelihood of rehabilitation." The court noted, with respect to rehabilitation, it "struggle[d] with mandatory sentencing provisions" but said, "I do have to follow the law." The court further noted, "The defendant is [*sic*] 23 years of age *** at the time of the offense. There's different sentencing factors that are taken into consideration if defendant was eighteen years of age or under or even if he was under the age of 21." The court reviewed the statutory factors in aggravation and mitigation, including Williams' upbringing, family situation, performance in school, and employment history. Ultimately, the court found, "As much as I know that 71 years is a very long sentence, based on the facts of this case here, I don't see this being an isolated incident, something that can be explained away, something that can be impulsively decided, a decision made at that point in time that would require me to consider a minimum sentence. I just don't. I can't."

¶ 68     Williams' assertion that there was a "reasonable probability" the court would have imposed a lower sentence had counsel performed as Williams suggests is belied by the record. While Williams claims "the court expressed frustration with having to apply the mandatory minimum," the court explicitly chose not to apply that mandatory minimum sentence—instead imposing a sentence seven years longer than the minimum. The trial court was aware "71 years is a very long sentence" and Williams was too old to be eligible for parole after 20 years, but nevertheless

declined to impose the minimum sentence "based on the facts of this case." The court found the shooting was not "an isolated incident, something that can be explained away, something that can be impulsively decided, a decision made at that point in time." Even after acknowledging "youths sometimes make impulsive decisions, are more prone to influence, that their brains have not fully developed," the court explicitly rejected the idea the murder in this case was the product of impulsivity. Instead, the shooting was "very well planned. It was preplanned. It was timed. It was waiting for the individual" and "nothing short of *** an ambush."

¶ 69        Nothing in the record before us establishes that absent trial counsel's alleged deficiencies, there was even a "reasonable probability" the trial court would have found the mitigating circumstances precluded the sentence imposed.

¶ 70        The facts of this case are markedly different from those in *People v. Estrada*, 2024 IL App (1st) 230029-U, which Williams argues is analogous. In *Estrada*, the 23-year-old defendant was initially sentenced to an aggregate sentence of 80 years' imprisonment for murder and attempt murder while personally discharging a firearm. *Id.* ¶¶ 2,15. After "decade-long postconviction proceedings" and a third stage evidentiary hearing on the defendant's successive postconviction petition, the circuit court ordered a new sentencing hearing. *Id.* ¶ 2. At the resentencing hearing, defense counsel discussed recent cases that "cited several studies showing that young adults are more like juveniles than fully mature adults" and asserted "that studies have shown that the brain is still immature until 25 years of age." *Id.* ¶ 23. However, counsel did not introduce "any evidence whatsoever at the resentencing hearing about [the defendant's] developmental maturity at the time of the offense." *Id.* ¶ 53.

¶ 71        At the conclusion of the resentencing hearing, the court ultimately sentenced Estrada to the statutory minimum sentence of 71 years' imprisonment. *Id.* ¶ 37. The court explained:

“[T]he only evidence that was presented for me to be able to look at that and see whether

or not this would be an unconstitutional sentence as applied to [the defendant] is basically that the brains [*sic*] is still immature. However, when I look at all the evidence, the Presentence Investigation and everything [the defendant] has done, there's nothing for me to base a finding to go under the minimum in this case." *Id.* ¶ 55.

The court further stated:

"[U]nless I see evidence to ignore the enhancements and to ignore the law, which I don't find, which is looking at all the evidence presented, simply arguing that your brain was not developed at 23 and that I should therefore ignore the enhancements, I don't find is sufficient or proper for me to do." *Id.*

¶ 72    In finding Estrada was prejudiced by his counsel's deficient performance, we found it was "apparent" from the circuit court's ruling the defendant's sentence was based on defense counsel's "failure to provide any factual or legal evidence regarding the defendant's immaturity so as to support a claim that under the proportionate penalties clause the evolving science on juvenile maturity and brain development applied to the defendant's case." *Id.* ¶ 56. Given the circuit court's "explicit recognition of the defendant's substantial rehabilitative efforts while incarcerated, and her statement that she was limited by the nearly non-existent evidence offered by defense counsel in imposing the statutory minimum sentence," we found there was a reasonable probability that, but for counsel's deficient performance, the court would have imposed a lesser sentence.

¶ 73    Here, the court's comments expressed no such reservations about the performance of defense counsel or the absence of evidence of Williams' specific characteristics. Unlike in *Estrada*, the court did not express regret that it could not sentence less than the statutory minimum. In fact, it imposed a sentence higher than the minimum. Williams has not shown there was a reasonable possibility that, had defense counsel put forth the argument he now suggests, the court would have imposed a sentence below the statutory minimum when the court did not even impose the

minimum in the first place. Having failed to establish prejudice, Williams' ineffective assistance claim necessarily fails.

¶ 74                               2. *Applicable Sentencing Range*

¶ 75        Finally, Williams argues "the court's belief that it could not sentence Williams to less than 71 years in prison is by itself a sufficient basis for this Court to vacate Williams' sentence and remand for re-sentencing." Williams does not argue the trial court misapprehended the applicable statutory sentencing range but asserts the trial court was apparently unaware it could *sua sponte* decide that the statutory minimum sentence violated the proportionate clause as it applied to Williams.

¶ 76        The trial court is "presumed to know the law and apply it properly." *People v. Howery*, 178 Ill. 2d 1, 32 (1997). This presumption is rebutted only when "the record contains strong affirmative evidence to the contrary." *Id.* There is no such evidence in this case.

¶ 77        Before imposing sentence, the trial court confirmed the applicable statutory minimum sentence. The court also noted Williams was 23 years old at the time of the offense and recognized, "There's different sentencing factors that are taken into consideration if defendant was eighteen years of age or under or even if he was under the age of 21. Individuals committing murder under the age of 21 now are eligible *** for parole after serving a twenty-year sentence." The court explained, "[W]e don't afford that opportunity to people over the age of 21" because "these statutes are the choice of our legislatures in order to take into consideration that youths sometimes make impulsive decisions, are more prone to influence, that their brains have not fully developed." As previously noted, the court declined to impose the statutory minimum sentence in this case even after these considerations. The record does not contain "strong affirmative evidence" to rebut the presumption the court knew and applied the proper law in imposing Williams' sentence.

¶ 78        Williams relies on *People v. Richards*, 2021 IL App (1st) 192154, in support of his

contention he is entitled to a new sentencing hearing. We find *Richards* inapposite. In *Richards*, the trial court erred in explicitly finding the defendant's prior second degree murder conviction was a qualifying predicate offense to render him subject to elevated sentencing guidelines following his conviction for unlawful use of a weapon by a felon. *Id.* ¶ 30. In this case, the trial court did not misapply the law or improperly subject Williams to elevated sentencing guidelines. Accordingly, we affirm the sentence of the trial court.

¶ 79                                III. CONCLUSION

¶ 80          For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 81          Affirmed.